## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

PASTA E MARE CO.,                                       Case No.:
a Florida Profit Corporation, and
ARMANDO MANTILLA, an individual,

      Plaintiffs,

v.

POMPANO BEACH CLUB RECREATION
CENTER, INC., a Florida Not-for-Profit Corporation,
JEANNINE LESBURT, an individual,
RONALD RITTER, an individual,
PAMELA TOBIAS, an individual, and
EDITH "JAN" IGNOZZI, an individual,

      Defendants.

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR RELIEF

Plaintiffs, PASTA E MARE CO., a Florida Profit Corporation, and ARMANDO

MANTILLA, an individual (collectively "Plaintiffs"), by and through undersigned counsel in the

above-styled cause, hereby file this Complaint for Damages and Demand for Relief against

Defendants, POMPANO BEACH CLUB RECREATION CENTER, INC., a Florida Not-for-

Profit Corporation, JEANNINE LESBURT, RONALD RITTER, PAMELA TOBIAS, and EDITH

"JAN" IGNOZZI, individuals (collectively, "Defendants"), for discrimination and retaliation

under 42 U.S.C. § 1981; violations of the Florida Whistleblower Act; breach of contract; breach

of the implied duty of good faith and fair dealing; tortious interference with contract; tortious

interference with prospective business relationships; trespass to chattels; conversion; civil

conspiracy; violation of § 772.104, Florida Criminal Practices Act (extortion); intentional

infliction of emotional distress; negligent infliction of emotional distress; and defamation, and hereby alleges as follows:

## **INTRODUCTION**

We begin with what this case *is* and what it is *not*.

This is a *racist breach of contract case* in which Plaintiff, Armando Mantilla ("Mantilla"), was prohibited from operating his restaurant, Pasta E Mare, mere days after opening because he had the *audacity* to hire a Hispanic chef.

This *is not* a case involving pretext. The explicit racist and xenophobic actions of Defendant Jeannine Lesburt—actions ratified by Defendants Ronald Ritter, Pamela Tobias, Edith "Jan" Ignozzi, and most importantly Pompano Beach Club Recreation Center, Inc.—were clear, unequivocal, and direct.

As further elaborated below, Defendant Jeannine Lesburt—President of the Pompono Beach Club Recreation Center, Inc.'s Board of Governors—*yelled* at Mantilla in front of the rest of the Board: "***I want to be very clear. I don't want any Hispanics in that kitchen. Period. . . . The restaurant is closed until you find an American chef.***

Defendant Jeannine Lesburt and the rest of the Board of Governors thereafter held true to her wretched words. They closed the restaurant, permanently prohibiting Mantilla from operating his business. They changed the locks, permanently prohibiting Mantilla from accessing his personal effects, effects which included his *chemotherapy medication*. And they drafted and sent Mantilla a *notarized* letter, formally ending the contractual relationship between Pompano Beach Club Recreation Center, Inc. and Pasta E Mare.

2

As Mantilla later exclaimed, "I feel run over, harassed in my name, and outraged in my rights as a person and as a professional." They humiliated him. They defamed him. They stole from him. They took away his livelihood. And they weren't finished.

Three weeks later, Pompano Beach Club Recreation Center, Inc. hired an attorney to draft a demand letter. There, the attorney demanded Mantilla pay $14,400.00 in damages for "abandon[ing] the Restaurant." The Pompano Beach Club Recreation Center, Inc. demanded $14,400.00 for Mantilla "abandon[ing]" the very restaurant *they* closed, the very restaurant in which *they* changed the locks, and the very restaurant about which *they* drafted and notarized a letter formally discontinuing any further contractual relationship. Oh, the *audacity*.

Unsurprisingly, Plaintiffs Armando Mantilla and Pasta E Mare face no choice but to turn to their last bastion of hope in order to vindicate their rights: the Federal Court System. This lawsuit ensues.

## PARTIES

1.      Plaintiff Pasta E Mare Co. ("PEM" or "Restaurant") is a Profit Corporation organized under the laws of Florida with its principal place of business at 111 Briny Avenue, Unit 1914, Pompano Beach, FL 33062, and is otherwise *sui juris*.

2.      Plaintiff Armando Mantilla (hereinafter "Mantilla") is a natural person and a resident of Broward County, Florida and is otherwise *sui juris*.

3.      Defendant Pompano Beach Club Recreation Center, Inc. ("Defendant PBC") is a Not-for-Profit Corporation organized under the laws of Florida with its principal place of business at 100 Briny Avenue, Pompano Beach, FL 33062 and is otherwise *sui juris*.

4.     Defendant Jeannine Lesburt ("President Lesburt") is a natural person and was at all material times President of Defendant PBC's Board of Governors. Upon information and belief, President Lesburt is a resident of Broward County, Florida and is otherwise *sui juris*.

5.     Defendant Ronald Ritter ("VP Ritter") is a natural person and was at all material times Vice President of Defendant PBC's Board of Governors. Upon information and belief, VP Ritter is a resident of Broward County, Florida and is otherwise *sui juris*.

6.     Defendant Pamela Tobias ("Treasurer Tobias") is a natural person and was at all material times Treasurer of Defendant PBC's Board of Governors. Upon information and belief, Treasurer Tobias is a resident of Broward County, Florida and is otherwise *sui juris*.

7.     Defendant Edith "Jan" Ignozzi ("Secretary Ignozzi") is a natural person and was at all material times Secretary of Defendant PBC's Board of Governors. Upon information and belief, Secretary Ignozzi is a resident of Broward County, Florida and is otherwise *sui juris*.

## JURISDICTION, VENUE, AND ADMINISTRATIVE REMEDIES

8.     This is an action for damages exceeding one million ($1,000,000.00) dollars excluding attorneys' fees, interest, and costs.

9.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1981. The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiff's claims under Florida law form the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share common nuclei of operative facts with his federal law claim, and the parties are identical. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

10.     Venue is proper in this district under 42 U.S.C. § 1391(b)(1)–(2) because all Defendants are residents of the State of Florida and all reside in this judicial district, the tortious

4

acts were committed in this district, the relevant records are maintained in this district, the majority of material witnesses live in this district, and Defendant PBC contracted with PEM in this District.

11.     This Court has personal jurisdiction over Defendant PBC because Defendant PBC is a Florida Not-for-Profit Corporation with its principal place of business in Florida at 100 Briny Avenue, Pompano Beach, FL 33062.

12.     This Court has personal jurisdiction over President Lesburt because President Lesburt is domiciled in the State of Florida.

13.     This Court has personal jurisdiction over VP Ritter because VP Ritter is domiciled in the State of Florida.

14.     This Court has personal jurisdiction over Treasurer Tobias because Treasurer Tobias is domiciled in the State of Florida.

15.     This Court has personal jurisdiction over Secretary Ignozzi because Secretary Ignozzi is domiciled in the State of Florida.

## FACTUAL ALLEGATIONS

### Background

16.     Armando de José Mantilla, born in Colombia, is a White Hispanic Male with an indígena bloodline.

17.     At all material times hereto, Mantilla—a nine-time restauranter with restaurants in Florida, Colombia, and Venezuela—was the owner, operator, manager, and the veritable face of PEM. Mantilla's duties included managing all day-to-day operations, purchasing supplies, menu design, recipe preparation, supervising staff, and running the business in all material aspects.

18.     Defendant PBC is a self-proclaimed multi-purpose, state of the art recreation center located on the shores of Pompano Beach, serving residents of the 29-story Pompano Beach Club

North and South buildings. Defendant PBC's motto—"Where you should be"—reflects its proclamation that it offers the best amenities by the sea.

19.     Defendant PBC is controlled, managed, and operated by its duly elected Board of Governors ("PBC Board"). The PBC Board consists of eight members: a President, Vice President, Treasurer, Secretary, two Governors, and two alternates.

20.     The PBC Board's duties include, *inter alia*, making and enforcing rules, operating Recreation Center areas, setting rental rates and offering rental space, issuing permits, and—pertinent to the instant action—entering into contracts with the operators of dining establishments to serve food and beverages to residents.

21.     Mantilla is a resident of the Pompano Beach Club South building. In or around the Spring of 2022, Mantilla became aware that Defendant PBC wished to open a restaurant on the premises.

22.     On or around May 30, 2022, Mantilla sent Defendant PBC a proposal for a restaurant. *See* **Exhibit A**.

23.     After informal talks commenced about Mantilla hosting a tasting, on or around October 15, 2022, Mantilla received a ServSafe Certification.[1] *See* **Exhibit B**.

24.     On or around October 19, 2022, Mantilla hosted a tasting for the PBC Board. There, Mantilla told the PBC Board the name of his restaurant would be "Pasta E Mare: Italian Seafood." The tasting included his anticipated signature dish, Linguine Frutti di Mare.

---

1.     "The ServSafe Manager Certification verifies that a manager or person-in-charge has sufficient food safety knowledge to protect the public from foodborne illness. . . . The ServSafe Manager Certification is accredited by the American National Standards Institute (ANSI) under the Conference for Food Protection Standards." *FAQs by ServSafe Product*, SERVSAFE, https://www.servsafe.com/ServSafe-Manager/FAQs#!/ (last visited Mar. 21, 2023).

25.     The PBC Board was wowed. Accordingly, they gave Mr. Mantilla positive feedback and expressly approved Mantilla's proposed restaurant name, concept, and menu.

26.     After the tasting, Mantilla was approached by President Lesburt, who stated that Defendant PBC "wants 10% of gross sales." Taken aback, and understanding that contractual negotiations had not officially commenced, Mantilla did not respond.

27.     Thereafter, Mantilla and Defendant PBC commenced contract negotiations. On or around October 25, 2022, Defendant PBC tendered Mantilla with keys to the restaurant while contract negotiations were ongoing and allowed him to enter at his discretion.

28.     On December 2, 2022, PEM and Defendant PBC entered into a legally valid and binding contract. *See* **Exhibit C**, attached and incorporated herein (hereinafter "Contract").

29.     Under the Contract, PEM was to provide food and beverage services on behalf of Defendant PBC to the residents in Pompano Beach Club community. *See id.* at 1.

30.     Pursuant to section 21(a), the Contract was for a term of five (5) years. *See id.* at 18 ¶ 21(a).

31.     Throughout the month of December, Mantilla worked diligently to prepare for the Restaurant's opening. Unfortunately for Mantilla, the electrical system Defendant PBC provided for PEM's space was not set up to withstand all the machinery necessary to operate PEM. On or around the middle of December 2022, Mantilla contacted the Recreation Building Supervisor ("Supervisor Alexs") to fix the system. Supervisor Alexs directed Mantilla to fix it himself. Specifically, Supervisor Alexs told Mantilla it was easy: just go around back and flip the circuit breaker switches. When Mantilla obliged, he flipped the breaker and was electrocuted. He sustained significant injuries to his hand. *See* **Composite Exhibit D**.

32.     As a result of Mantilla's injuries, he was unable to cook for several weeks. Due to his inability to cook, was forced to hire a temporary chef for PEM's opening.

33.     On December 27, 2022, PEM held a soft opening. In attendance was President Lesburt. President Lesburt pulled Mantilla aside and again requested 10% of gross sales.

34.     This time, however, Mantilla already had a signed Contract. The Contract said nothing about 10% of gross sales. Mantilla took President Lesburt's request as a clear attempt to secure under-the-table kickbacks for the individual PBC Board members. Accordingly, Mantilla said no.

35.     PBC Board Officer Barbara Barkley ("Officer Barkley") was also in attendance at the soft opening and had an enjoyable meal. She told Mantilla the food was great, and everything was ready to go for the hard open, with one exception: he needed to get a Health Inspector in. Mantilla did as he was told.

36.     On December 28, 2022, at 9:30 AM, the Health Inspector arrived. The Health Inspector made two minor suggestions for improvement, and personally explained that neither prevented PEM from lawfully operating. Accordingly, at 10:36 AM, the Health Inspector granted PEM a Permanent Food Service-Seating Licensure ("Food License"), valid for thirty (30) days. *See* **Exhibit E**.

37.     By granting PEM the Food License, the Health Inspector gave Mantilla express permission to formally open the Restaurant and stated that he would come back in a month or so to see how things were going.

38.     Upon receiving the Food License, Mantilla registered PEM online and received an Annual License, good for one year. *See* **Exhibit F**.

39.     With a license to operate now successfully in tow, Mantilla officially opened PEM that same day.

**December 28, 2022: The Racist Tirade**

40.     On December 28, 2022, in compliance with the Health Inspector's blessing to validly operate under Florida law, PEM officially opened its doors for business.

41.     Business was going well. Until 2:30 PM.

42.     At 2:30 PM, the Supervisor Alexs informed Mantilla that Mantilla had make himself available for an emergency meeting with the PBC Board at 3:00 PM.

43.     At approximately 3:00 PM, Mantilla arrived for the meeting. Individual Defendants President Lesburt, VP Ritter, and Secretary Ignozzi were all in attendance. So too were Officer Barkley, PBC Board Officer Michael McKittrick ("Officer McKittrick"), and Supervisor Alexs. The meeting would change the course of the parties' entire relationship.

44.     President Lesburt wasted no time before launching into a deplorable racist and xenophobic tirade. In the presence of VP Ritter, Secretary Ignozzi, Officer Barkley, Officer McKittrick, and Supervisor Alexs, President Lesburt spewed discriminatory animus, demanded immediate change, and illegally breached PEM's Contract.

45.     To wit, President Lesburt began by demanding Mantilla fire PEM's chef immediately. The reason? Because the chef "does not speak English."

46.      Mantilla objected. He then countered: "the chef is temporary because the permanent chef is out of town for the holidays and will return on January 6, 2023."

47.     President Lesburt responded: "does the new chef speak English?"

48.     Mantilla assured her: "yes, he has lived in the United States for thirty (30) years."

49.     This assurance did not assuage President Lesburt's patently offensive fears. In fact, it only enraged her: "wait," she interrupted. "Is he American?"

50.     Mantilla answered: "He is an American citizen but was born in Venezuela."

51.     President Lesburt, taken over by her unrelenting discriminatory animus, boiled into a sudden, shouting rage: **"I WANT TO BE VERY CLEAR. I DON'T WANT ANY _HISPANICS_ IN THAT KITCHEN. PERIOD."**

52.     Mantilla was in shock. The PBC Board was silent. President Lesburt continued: **"WE HAVE ELECTIONS FOR THE BOARD IN FEBRUARY AND WE CAN'T TAKE A CHANCE TO LOSE THE ELECTION WITH _HISPANICS_ COOKING OUR FOOD. GO TO DENNY'S OR WENDY'S OR IHOP AND FIND. SOMEONE. ELSE."**

53.     President Lesburt was not done. She concluded: **THE RESTAURANT IS _CLOSED_ UNTIL YOU FIND AN _AMERICAN_ CHEF.**

54.     Mantilla was in disbelief. This was no mere threat. President Lesburt was explicit, guaranteeing Mantilla that the PBC Board would put signs out the following day announcing the Restaurant's closure. President Lesburt and the PBC Board held true to her word.

**December 29, 2022: The PBC Board's Unilateral Restaurant Closure**

55.     On December 29, 2022, Mantilla showed up to the restaurant and was greeted by a sign posted by the PBC Board. *See* **Exhibit G** (picture taken December 29, 2022, at 11:47 AM). True to President Lesburt's word, the sign read as follows:

> **THIS IS TO INFORM YOU THAT THE CAFÉ BY THE SEA WILL BE CLOSED UNTIL FURTHER NOTICE DUE TO REPAIR ISSUES. SORRY FOR ANY INCONVENIENCE.**

*See id.*

56.     There were no actual "repair issues."

57.     The sign was signed by the "PBC RECREATION CENTER BOARD OF GOVERNORS." *See id.*

58.     Defendant PBC's motto, "Where you should be," apparently does not apply to Hispanic and non-native English speaking chefs.

59.     Defendant PBC's motto, "Where you should be," apparently does not apply to those who hire Hispanic and non-native English speaking chefs either.

60.     Notwithstanding the sign's implicit directive to Mantilla and all potential PEM patrons that PEM was not, in fact, where Hispanics and those who hire Hispanics "should be"— and despite Defendant PBC's explicit racist actions and unilateral restaurant closure—Mantilla, himself of Hispanic origin, was amenable to resolution. He sent the same detailed text message to several individual members of the PBC Board. *See* **Exhibit H**. He noted the text was in *direct response* to the meeting held on December 28, 2022. He addressed the Board's concerns; the sign; and President Lesburt's racist acts. *See* **Exhibit I**.

61.     Specifically, Mantilla addressed menu concerns: "Although the last menu is the result of our previous conversation in this regard, where the changes that you suggested were introduced," Armando told the board he would remove all the Italian dishes (despite the name of the restaurant) and offered to change the menu to 100% American food. *See id.* This change, Mantilla thought, would allow PEM to return to business because the change aligned with President Lesburt's racist ideals.

62.     Mantilla also addressed the removal of the Hispanic Chef: "I have discarded the option of the Venezuelan Chef . . . for attending [Defendant Lesburt's] request not to want a Hispanic Chef in the restaurant's kitchen . . . ." *See id*.

63.     Mantilla reiterated his disappointment that "there was no need to close the restaurant with just two open days." *See id.* He also noted he was amenable to changing the condiment dispensers, hiring a PBC Board-selected resident as one of his employees, and putting the past racist remarks behind him in an effort to work things out and move forward. *See id.*

64.     At 6:55 PM, President Lesburt created a group text message in which she offered a response. *See* **Exhibit J**.

65.     In her response, President Lesburt did not refute or respond to Mantilla's direct accusations about her unlawful conduct. Nor did any other PBC Board member whom Mantilla contacted respond about Mantilla's direct accusations regarding President Lesburt's unlawful conduct and Defendant PBC's unlawful ratification of President Lesburt's conduct.

66.     Any reasonable person who did not spew racial and ethnic animus about terminating and refusing to hire person(s) of Hispanic origin would undoubtedly have *categorically denied* making such assertion. *See, e.g.,* Fed. R. Evid. 801(d)(2)(B).

67.     Instead, Defendant Lesburt told Mantilla: "I along with the board had to close the café and it will remain closed until the board is completely satisfied with what we contracted you to do." *See id.*

**December 30, 2022: The Ouster**

68.     On December 30, 2022, Mr. Mantilla agreed to meet VP Ritter for breakfast at 10:00 AM in an attempt to work things out.

69.     VP Ritter asked Mantilla how the situation could be cured. Mantilla retorted: "you are the one who did everything; you discriminated against me and my chef; then you closed the restaurant. You tell me.

70.     Mantilla recounted President Lesburt's racist tirade to VP Ritter. VP Ritter was there; he knew what was said; he knew what was done. He profusely apologized.

71.     Still, although VP Ritter made groveling apologies for President Lesburt's behavior, he also simultaneously made excuses for her: "I'm so sorry, maybe she just wants somebody who speaks English?"

72.     Mantilla offered a reminder: President Lesburt was specific and clear. Remember, Mantilla further advised: he told President Lesburt the new chef speaks *perfect* English. But President Lesburt did not care. *It wasn't about the language; it was about race, ethnicity, and national origin*.

73.     VP Ritter conceded: "That's true. I'm so sorry. When she said that, I was in shock."

74.     The meeting ended on good terms and VP Ritter said he would follow up with Mantilla about making things right. This, VP Ritter did not do.

75.     Around 3:00 PM that afternoon, with PEM closed indefinitely, Mantilla and his wife went to the Restaurant to remove food to prevent spoilage. They grabbed several items—all items in which PEM was the sole and rightful owner—returned them to Restaurant Depot, Walmart, and Aldi, and drove back. At around 5:30 PM, Mantilla returned to find Juan—Defendant PBC's maintenance person—*changing the locks* to the Restaurant.

76.     Mantilla, beside himself, asked Juan what was going on. Juan told Mantilla he was sent by Defendant PBC on an "emergency basis" to change the locks and prevent Mantilla from entering.

77.     Mantilla was prohibited from entering his own Restaurant. He was prohibited from removing his personal items from the Restaurant. And he was prohibited from securing his *chemotherapy medication*.

78.     Indeed, Mantilla has prostate cancer, a fact well within the knowledge of President Lesburt, the rest of the PBC Board, and all parties involved.

79.     In an effort to reacquire his *chemotherapy medication*, Mantilla asked Juan if Mantilla could go inside.

80.     All the while, Juan was on speaker on his cell phone with Supervisor Alexs. Hearing Mantilla's request, Supervisor Alexs said "no." He then commanded: "if Mantilla tries to get in, *call the police*."

81.     At 6:36 PM, Mantilla sent a text to VP Ritter: "I arrived at the café and found Juan inside, changing the lock on express instructions from the Board . . . . I wonder, does [Defendant Lesburt] also want to take all of my personal belongings that are inside the Snak-Bar? Now I do believe that the dialogue bridges are absolutely broken. At this moment I feel run over, harassed in my name, and outraged in my rights as a person and as a professional." *See* **Exhibit K**.

82.     At this point, Mantilla was permanently locked out of his Restaurant. He was prohibited from securing his personal effects, including his cancer medication. He was humiliated and treated like a second-class citizen. But Defendant PBC was not done.

83.     At 11:12 PM, Treasurer Tobias sent Mantilla an email with the subject line "Termination of Agreement." *See* **Exhibit L**.

84.     Treasurer Tobias's email was clear: "In accordance with the terms of Section 21 outlined in the signed agreement, we are terminating this agreement and request you cease operations on the property of the Pompano Beach Club Recreation Center." *See id.*

85.     Treasurer Tobias' repudiation of the Contract was unequivocal. Yet on the off chance her email left room for doubt, she attached a signed and *notarized* letter repeating same. *See* **Exhibit M**.

14

86.     All told, on December 30, 2022—three days after PEM's soft open; two days after PEM's official open; two days after President Lesburt's racist and xenophobic tirade; one day after Defendant PBC's unilateral closure of the Restaurant; and on the very same day Defendant PBC changed the locks preventing Mantilla from securing his *chemotherapy* medication—Defendant PBC officially terminated the Contract.

### January 2023: The Aftermath

87.     In or around January 2023, Defendant PBC engaged legal representation for the purposes of what one can only assume was to further disparage, defame, harass, and defraud Mantilla and PEM.

88.     To wit, on January 19, 2023, the law firm of Kopelowitz Ostro, P.A.,[2] on behalf of Defendant PBC, sent a demand letter ("Letter") to Mantilla alleging, *inter alia*:

   a) "PEM has failed to provide Services at the Restaurant since December 26, 2022";

   b) PEM "has completely abandoned the Restaurant and its obligations under the Agreement";

   c) PEM "refuses to return to the Restaurant despite PBC's request for same";

   d) "PEM's actions and failures have led to an unkempt appearance in the Restaurant";

   e) Defendant "PBC is simply unable and unwilling to wait any longer for PEM to perform its duties in a professional manner"; and

---

2.     Plaintiffs recognize Kopelowitz Ostro, P.A. was likely an unwitting vehicle to Defendant PBC's malicious and calculated attempt to harass, defame, defraud, and extort Mantilla and PEM.

f)   "PEM has failed to keep up the appearance of the Restaurant, leaving it in a state in which it always appears closed and uninviting." *See* **Exhibit N**.

89.   Indeed, after: (i) unilaterally closing Mantilla's Restaurant because he hired a Hispanic chef; (ii) permanently changing the locks to Mantilla's Restaurant, preventing him from entering or securing his personal effects under threats of Police involvement; and (iii) sending Mantilla a *notarized* letter repudiating their Contract, Defendant PBC hired counsel to unironically claim PEM "defaulted in the performance of its obligations" because it "completely abandoned the Restaurant," left it in an "unkempt" "state in which it always appears closed," and "refuses to return." *See id.*

90.   *[THIS PARAGRAPH LEFT INTENTIONALLY BLANK TO ALLOW THE PRIOR PARAGRAPH TO SINK IN].*

91.   As if it couldn't get any worse for Mantilla—who was undergoing cancer treatment at the time he received the Letter—Defendant PBC also demanded liquidated damages "in the amount of $14,400," *and* that "PEM remove all of its personal property from the Premises" that is, the very premises in which Defendant PBC willfully, maliciously, and permanently prevented Mantilla from entering by changing the locks three weeks prior. *See id.*

92.   And just for good measure—because, *why not*—Defendant PBC also willfully, falsely, and maliciously accused Mantilla of "blatantly violat[ing] criminal law by secretly recording conversations with PBC's representative without their knowledge or consent." *See id.* Upon information and belief, this malicious smear job falsely accusing Mantilla of criminal acts was effected for the sole purpose of gaining an advantage in a prospective civil dispute.

93.     Stated simply, Defendants' actions violate Plaintiffs' rights pursuant to a host of Florida and Federal statutory and common law causes of action. Mantilla and PEM bring suit to vindicate those rights. This litigation ensues.

**COUNT I—SECTION 1981**
**Race Discrimination, Associational Race Discrimination, and Retaliation**
**(PEM and Mantilla against Defendant PBC)**

94.     Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

95.     Mantilla is a White Hispanic Male. As a White Hispanic Male, Mantilla is a member of a protected class.

96.     Mantilla and PEM were also equal opportunity employers, who hired all races, including Hispanics, for work in their kitchens.

97.     Defendants Lesburt, Ritter, Tobias, and Ignozzi are Caucasian. As members of Defendant PBC's Board, they are all agents of Defendant PBC.

98.     The Eleventh Circuit recognizes associational discrimination claims, which are based on familial or other relationships with persons discriminated against based on race and ethnicity. *See, e.g., Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir. 1986).

99.     Defendant's intentional discriminatory and retaliatory actions, as set forth herein, deprived Mantilla and PEM of the rights guaranteed under 42 U.S.C. §1981; as such, its remedies are implicated.

100.     Mantilla and PEM had the right to make and enforce contracts, to sue, and to receive the full and equal benefit of all laws.

101.    Defendant PBC abridged Mantilla's and PEM's rights to make, enforce, and perform contracts by its intentional discriminatory conduct toward Mantilla, PEM, and PEM's Hispanic employees.

102.    As a direct and proximate result of Defendant PBC's actions, Defendant PBC has denied Mantilla and PEM the right to the same terms, conditions, privileges and benefits of their contractual relationship, employment relationship, and/or independent contracting arrangement with Defendant PBC.

103.    Defendant PBC, by and through its Board members, intentionally discriminated and retaliated against Mantilla and PEM on the basis of: (i) Mantilla's race, ethnicity, and/or national origin; and (ii) Mantilla's association with PEM's employees based on the employees' race, color, ethnicity, and/or national origin; (iii) PEM's equal opportunity employment hiring practices in which it employees, *inter alia*, Hispanic chefs; and (iv) PEM's association with its employees based on the employees' race, color, ethnicity, and/or national origin.

104.    Defendant PBC's actions altered Mantilla and PEM's work environment, and indeed precluded Mantilla's and PEM's ability to conduct work at all.

105.    The discrimination that Mantilla faced detrimentally affected Mantilla. This discrimination would detrimentally affect any reasonable person in the same or similar circumstances.

106.    PEM's temporary chef, a foreign-born Hispanic, was qualified for the position he held. PEM's permanent chef, a foreign-born Hispanic, was qualified for the position he held. Both are members of protected classes.

107.    Defendant PBC demanded each Hispanic chef be terminated from PEM's employ on the basis of their race, color, national origin, and/or ethnicity.

108. Defendant PBC further demanded PEM's closure for not employing and/or immediately hiring an American Chef.

109. After Mantilla objected to the Restaurant's unlawful closure, Defendant PBC retaliated against PEM by changing the locks to the Restaurant and terminating the contract.

110. After Mantilla objected to the Restaurant's unlawful closure, Defendant PBC retaliated against Mantilla by changing the locks to the Restaurant, defamed him on multiple occasions, *see infra* ¶¶ 226, 237, and prevented him from securing his personal effects.

111. By objecting and/or complaining about the illegal discrimination on multiple occasions, Mantilla engaged in a protected activity. He was subsequently retaliated against because of his participation in that protected activity and a causal connection exists between Mantilla's complaints and the adverse actions taken against him and PEM.

112. Defendant PBC is vicariously liable for the actions of its individual Board members under Respondeat Superior.

113. Every contractual agreement carries with it the implied covenant of good faith and fair dealing. Consistent with this duty, where discretion is given under a contract, the discretion must be exercised reasonably. Discrimination based on race, color, ethnicity, and/or national origin is patently and unquestionably unreasonable.

114. Defendant PBC's actions in abridging Mantilla and PEM's rights under the contract, as well as terminating the Contract, were a result of willful and malicious misconduct.

115. Defendant PBC's intentional, discriminatory, and retaliatory acts were done with deliberate indifference to the statutory and constitutional rights of Mantilla and PEM.

116.     As a direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful abridging and breach of the Contract thereof, Mantilla and PEM have suffered and will continue to suffer damages.

117.     As a direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful termination of the Contract thereof, PEM has suffered and will continue to suffer lost profits for a period of five (5) years, as Mantilla, the owner/operator of PEM and an established business owner and nine-time restaurateur, is reasonably certain what the amount of his actual loss over the duration of the Contract would be. *See Babe, Inc. v. Baby's Formula Serv., Inc.*, 165 So. 2d 795, 798 (Fla. 3d DCA 1964).

118.     As a direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful termination of the Contract thereof, Mantilla has suffered and continues to suffer substantial economic damages, including but not limited to, losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay, past, present and future income, compensatory damages, lost wages and other employee benefits, all to his detriment, in an amount to be shown according to proof.

119.     As a further direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful termination of the Contract thereof, Mantilla has suffered and continues to suffer emotional distress, ongoing sadness, nausea, nightmares, irritability, nervousness, anxiety, loss of confidence, grief, sleeplessness, helplessness, hopelessness, fear, humiliation, loss of self-esteem, and other general emotional damages, all to his detriment, in an amount to be shown according to proof.

120.    As a result of Defendant PBC's intentional, willful, and unlawful actions, Mantilla has suffered damages, including but not limited to: lost wages, lost benefits, lost employment status, as well as humiliation, pain and suffering, and other monetary and non-monetary losses.

121.    As a result of Defendant PBC's unlawful acts as alleged herein, Mantilla and PEM are entitled to reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988(b).

122.    As a result of Defendant PBC's unlawful acts as alleged herein, Mantilla and PEM are entitled to experts' fees under 42 U.S.C. § 1988(c).

**WHEREFORE**, Plaintiffs, ARMANDO MANTILLA and PASTA E MARE, CO., respectfully request judgment in their favor and against Defendant, POMPANO BEACH CLUB RECREATION CENTER, INC., for actual and compensatory damages, emotional distress damages, punitive damages, such other damages as are appropriate under Section 1981, as well as costs and reasonable attorneys' fees, expert fees and other disbursements, and such other and further relief as is deemed proper by this Court.

<u>COUNT II—BREACH OF CONTRACT</u>
<u>(PEM against Defendant PBC)</u>

123.    Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

124.    On or about December 2, 2022, PEM and Defendant PBC entered into a valid contractual agreement in which PEM was to provide food and beverage services on behalf of Defendant PBC to the residents in the Pompano Beach Club community.

125.    The parties exchanged valuable consideration for their respective promises.

126.    The parties distilled their offer and acceptance into a written contractual agreement.

127.    The Contract was for a period of five (5) years.

128.    PEM performed all of its obligations arising under the contract. Defendant PBC did not.

129.    Indeed, Defendant PBC failed to perform its contractual obligations by willfully and maliciously forcing PEM to terminate PEM's chef on account of the chef's race, color, ethnicity, and/or national origin.

130.    Section 8(d) of the Contract reserves the right for Defendant PBC "to cause a Staff Employee to vacate the Premises," and ultimately force the Restaurant to "make a change in such personnel." *See* **Exhibit C**, at 9 ¶ 8(d). However, Defendant PBC cannot request a personnel change where such request is the result of "discriminat[ion] against any individuals based on race, color . . . [or] national origin . . . ." *Id.* Yet this is precisely what happened when:

    a)  Defendant PBC forced PEM to terminate its temporary chef because the chef is Hispanic;

    b)  Defendant PBC forced PEM to terminate its permanent chef because the chef was of a Hispanic who was born in Venezuela; and

    c)  Defendant PBC forced PEM to find and hire a new chef who is not Hispanic, a new chef who only speaks English, and a new chef who is American-born.

131.    Defendant PBC also breached its contractual obligations by unilaterally closing the Restaurant based on a discriminatory (illegal) reason, namely, that Defendant PBC refused to allow PEM to operate with a Hispanic chef at the helm.

132.    Defendant PBC again breached its contractual obligations by unilaterally changing the locks to the Restaurant based on a discriminatory (illegal) reason, namely, that Defendant PBC refused to allow PEM to operate until an American chef was hired.

133.    In further breach of the Contract, Defendant PBC terminated the Contract based on a discriminatory (illegal) reason, namely, that PEM did not hire an American chef within the allotted time period it arbitrarily required.

134.    Every contractual agreement carries with it the implied covenant of good faith and fair dealing. Consistent with this duty, where discretion is given under a contract, the discretion must be exercised reasonably. Discrimination based on race, color, ethnicity, and/or national origin is patently and unquestionably unreasonable.

135.     Defendant's actions in breaching and terminating the Contract were a result of willful and malicious misconduct.

136.     As a direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful breach of the Contract thereof, PEM has suffered and will continue to suffer damages.

137.    As a further direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful breach of the Contract thereof, PEM has suffered and will continue to suffer lost profits for a period of five (5) years, as Mantilla, the owner/operator of PEM and an established business owner and nine-time restaurateur, is reasonably certain what the amount of his actual loss over the duration of the Contract would be. *See Babe, Inc. v. Baby's Formula Serv., Inc.*, 165 So. 2d 795, 798 (Fla. 3d DCA 1964).

**WHEREFORE**, Plaintiff, PASTA E MARE, CO., respectfully requests a judgment in his favor and against Defendant, POMPANO BEACH CLUB RECREATION CENTER, INC., for its actual or expectation damages, special damages including lost profits, attorneys' fees and costs pursuant to section 23(c) of the Contract, and for such other and further relief as the Court deems just and proper.

## COUNT III—BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (PEM against Defendant PBC)

138.     Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 93 and 124 through 133 above, as though fully set forth herein.

139.     Florida law implies a duty of good faith and fair dealing in all contracts. Consistent with this duty, where discretion is given under a contract, the discretion must be exercised reasonably. Discrimination based on race, color, ethnicity, and/or national origin is patently and unquestionably unreasonable.

140.     Defendant PBC had a good faith obligation not to do anything that would impair PEM's ability to operate its business under the Contract.

141.     Defendant PBC breached its duty of good faith and fair dealing by:

   a)  Demanding the temporary Hispanic chef be fired for a discriminatory (illegal) reason;

   b)  Refusing to allow Mantilla to retain the permanent Hispanic chef;

   c)  Unilaterally closing the Restaurant;

   d)  Unilaterally changing the locks to the Restaurant; and

   e)  Terminating the Contract for a discriminatory (illegal) reason.

142.     PEM  has sustained damages as a direct and proximate result of Defendant PBC's breach of its duty of good faith and fair dealing.

143.     As a further direct and proximate result of Defendant PBC's intentional, discriminatory, and retaliatory practices and unlawful breach of the implied covenant of good faith and fair dealing, PEM has suffered and will continue to suffer lost profits for a period of five (5) years, as Mantilla, the owner/operator of PEM and an established business owner and nine-time

restaurateur, is reasonably certain what the amount of his actual loss over the duration of the Contract would be. *See Babe, Inc. v. Baby's Formula Serv., Inc.*, 165 So. 2d 795, 798 (Fla. 3d DCA 1964).

**WHEREFORE**, Plaintiff, PASTA E MARE, CO., respectfully requests a judgment in its favor and against Defendant, POMPANO BEACH CLUB RECREATION CENTER, INC., for damages, interest, attorneys' fees and costs pursuant to section 23(c) of the Contract, and for such other and further relief as the Court deems just and proper.

### COUNT IV—VIOLATION OF FLORIDA'S PRIVATE WHISTLEBLOWER ACT
### (Mantilla against Defendant PBC)

144. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 93 above, as though fully set forth at herein.

145. At all times material hereto, Mantilla was an Employee as defined by section 448.101(2), *Florida Statutes*.

146. At all times material hereto, Defendant PBC was an Employer as defined by section 448.101(3), *Florida Statutes*.

147. Although the express terms of the Contract stipulate that PEM's formal relationship with Defendant PBC is as an "independent contractor," the parties' formal label is not the test. The test is one of control. Under the Contract, Defendant PBC maintained such control over Mantilla (and PEM) that the relationship can only be characterized as an employer-employee relationship. *See* **Exhibit C**, at 8–9 ¶¶ 8(a)–(e); 11 ¶ 11; 11–12 ¶¶ 13(a)–(c); *see also* **Exhibit N**, at 1–2.

148. Section 448.102(3) of Florida's Private Sector Whistleblower Act provides: "An employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

149.   "In meeting this standard, however, all that is required is that the employee have a good faith, objectively reasonable belief that her activity is protected by the statute." *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. 4th DCA 2013) (cleaned up).

150.   Mantilla objected to violations of a law, rule, or regulation, or what he reasonably believed to be violations of a law, rule, or regulation, or refused to participate in same, and was retaliated against as a direct result of same, which constitutes a violation of Florida's Private Sector Whistleblower Act.

151.   More specifically, Mantilla issued lawful objections and/or complaints regarding:

a)  His unwillingness to give Defendant PBC's Board illegal kickbacks; and

b)  Defendant PBC's mandate that PEM terminate its temporary chef;

c)  Defendant PBC's mandate that PEM terminate its permanent chef;

d)  Defendant PBC's mandate that PEM hire an "American" chef; and

e)  Defendant PBC's unilateral closure of his Restaurant for discriminatory reasons.

152.   On December 30, 2022, Defendant PBC wrongfully and illegally terminated its relationship with Mantilla in violation of section 448.102(2), *Florida Statutes*, for objecting to the aforesaid illegal activities or what he reasonably believed to be illegal activities being conducted by Defendant PBC, and/or for refusing to participate in same.

153.   As a direct and proximate result of Defendant PBC's acts as alleged herein, Mantilla has suffered and continues to suffer substantial economic damages, including but not limited to, losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay, past, present and future income,

compensatory damages, lost wages and other employee benefits, all to his detriment, in an amount to be shown according to proof.

154.    As a further proximate result of Defendant PBC's acts as alleged herein, Mantilla has suffered and continues to suffer emotional distress, ongoing sadness, nausea, nightmares, irritability, nervousness, anxiety, loss of confidence, grief, sleeplessness, helplessness, hopelessness, fear, humiliation, loss of self-esteem, and other general emotional damages, all to his detriment, in an amount to be shown according to proof.

155.    As a result of Defendant PBC's intentional, willful, and unlawful actions, Mantilla has suffered damages, including but not limited to: lost wages, lost benefits, lost employment status, as well as humiliation, pain and suffering, and other monetary and non-monetary losses.

156.    As a result of Defendant PBC's unlawful acts as alleged herein, Mantilla is entitled to reasonable attorneys' fees and costs of suit pursuant to section 448.104, *Florida Statutes*.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, respectfully requests judgment in his favor and against Defendant POMPANO BEACH CLUB RECREATION CENTER, INC., for his actual and compensatory damages, emotional distress damages, as well as his costs and attorneys' fees, declaratory and injunctive relief, and such other and further relief as is deemed proper by this Court.

### COUNT V—TORTIOUS INTERFERENCE WITH CONTRACT
### (PEM against Defendant Jeannine Lesburt)

157.    Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

158.    On or around December 2, 2022, PEM entered into a Contract with Defendant PBC in which PEM was to provide food and beverage services on behalf of Defendant PBC to the residents in the Pompano Beach Club community.

159.   Defendant Lesburt knew of Plaintiffs' Contract with Defendant PBC.

160.   During the dates of December 28–30, 2022, and without justification or privilege, Defendant Lesburt intentionally interfered with this contract by:

    a)  Mandating that PEM terminate its temporary chef for discriminatory (illegal) reasons;

    b)  Mandating that PEM terminate its permanent chef for discriminatory (illegal) reasons;

    c)  Mandating that PEM hire an "American" chef for discriminatory (illegal) reasons;

    d)  Posting a sign outside the Restaurant falsely alleging that the Restaurant was closed for repair issues, when in fact the Restaurant was closed for discriminatory (illegal) reasons; and

    e)  Directing her agent(s) to change the locks to PEM so Mantilla could not enter, thereby preventing PEM from continuing to operate its business in any manner whatsoever.

161.   Defendant Lesburt's illegal discrimination caused Defendant PBC to terminate its contractual relationship with Plaintiff.

162.   Defendant Lesburt's interference was unjustified and unprivileged because, at all material times hereto, Defendant Lesburt:

    a)  Had no legal right to mandate PEM hire and fire employees for discriminatory reasons;

    b)  Had no legal right to close PEM; and

    c)  Had no legal right to change PEM's locks.

163.    Defendant Lesburt's calculated scheme and intentional actions were done solely with ulterior purposes, were harmful to PEM, were not in the best interests of Defendant PBC, and were done without any good faith belief or intent that her actions would benefit Defendant PBC.

164.    As a direct and proximate result of Defendant Lesburt's tortious interference, PEM has suffered substantial losses and damages in an amount to be determined according to proof.

165.    PEM has also suffered damages as a direct and proximate result of the wrongful acts of Defendant Jeannine Lesburt, including but not limited to injury to its business goodwill and professional reputation.

**WHEREFORE**, Plaintiff, PASTA E MARE, CO., respectfully requests a judgment in its favor and against Defendant JEANNINE LESBURT, for damages, costs, and such other and further relief as is deemed proper by this Court.

### COUNT VI—TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (PEM and Mantilla against Defendants Jeannine Lesburt, Ronald Ritter, Pamela Tobias, and Edith Ignozzi)

166.    Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

167.    On or around December 2, 2022, PEM entered into a Contract with Defendant PBC in which PEM was to provide food and beverage services on behalf of Defendant PBC to the residents in the Pompano Beach Club community.

168.    Mantilla, as owner/operator of PEM and resident of Pompano Beach Club, was the veritable face of PEM's business operations.

169.    PEM and Mantilla had a business relationship and/or prospective business relationship with many or all residents of the North and South Towers, as said residents enjoyed and/or were looking forward to dining at an establishment on Pompano Beach Club grounds.

170.     Defendants Lesburt, Ritter, Tobias, and Ignozzi ("Individual Defendants") knew of Plaintiff's business relationship with the residents of Pompano Beach Club.

171.     During the dates of December 28–30, 2022, and without justification or privilege, Individual Defendants intentionally interfered with this relationship by:

   a)  Posting a sign outside the Restaurant falsely alleging that the Restaurant was closed for repair issues, when in fact the Restaurant was closed for discriminatory (illegal) reasons; and

   b)  Directing their agent(s) to change the locks to PEM so Mantilla could not enter, thereby preventing PEM from further operating its business in any manner whatsoever.

172.     Individual Defendants' unilateral Restaurant closure caused PEM to lose prospective business in the form of patrons at its Restaurant.

173.     Individual Defendants' interference was unjustified and unprivileged because, at all material times hereto, Individual Defendants:

   a)  Had no legal right to close PEM; and

   b)  Had no legal right to change PEM's locks.

174.     Individual Defendants' calculated scheme and intentional actions were done solely with ulterior purposes, were harmful to Plaintiff, were not in the best interests of Defendant PBC, and were done without any good faith belief or intent that their actions would benefit Defendant PBC.

175.     As a direct and proximate result of Individual Defendants' tortious interference, Mantilla and PEM have suffered substantial economic losses and economic damages in an amount to be determined according to proof.

176.     As further direct and proximate result of the wrongful acts/breach of the foregoing duties of Individual Defendants, Mantilla has suffered, and continues to suffer, mental anguish, anxiety, ongoing sadness, grief, shock, anger, embarrassment, humiliation, helplessness, hopelessness, sleeplessness, nervousness, irritability, significant pain and suffering, loss of capacity for the enjoyment of life, and other emotional distress, all to his detriment in an amount to be determined according to proof.

177.     Individual Defendants' tortious conduct was the result of willful and malicious misconduct.

178.     Mantilla and PEM have also suffered damages as a direct and proximate result of the wrongful acts of individual Defendants, including but not limited to injury to their business and professional reputations.

**WHEREFORE**, Plaintiffs, ARMANDO MANTILLA and PASTA E MARE, CO., respectfully request a judgment in their favor and against Defendants JEANNINE LESBURT, RONALD RITTER, PAMELA TOBIAS, and EDITH IGNOZZI, for economic damages, emotional distress damages, punitive damages, costs, and such other and further relief as is deemed proper by this Court.

## COUNT VII—TRESPASS TO CHATTELS
### (PEM and Mantilla against Defendant PBC)

179.     Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

180.     On or about December 30, 2022, Defendant PBC intentionally prevented Mantilla and PEM from accessing and using several items of personal property inside the Restaurant, of which Mantilla and/or PEM were the rightful owners. These items include, but are not limited to: a commercial pizza oven; pizza dough mixer; pizza maker; panini grill; espresso machine; coffee

maker; POS register; cash inside the POS register; kitchen utensils and silverware; and Mantilla's chemotherapy medication.

181.    Defendant PBC intentionally, illegally, and wrongfully interfered with Mantilla and PEM's possession of same, without authority to do so, by changing the locks and directing its agent(s) to threaten the call the police, so that Mantilla could not recover said items of personal property.

182.    Defendant PBC had no rightful or legal justification for its actions.

183.    Despite demand, Mantilla was not allowed to access his or PEM's property for a period of around two (2) weeks.

184.    As a direct and proximate result of Defendant PBC's wrongful, willful, and intentional misconduct, Mantilla and PEM have been damaged in an amount to be determined according to proof.

**WHEREFORE**, Plaintiffs, ARMANDO MANTILLA and PASTA E MARE, CO., hereby demand judgment against Defendant, POMPANO BEACH CLUB RECREATION CENTER, INC., for actual damages, punitive damages, attorneys' fees and costs pursuant to applicable Florida law, and for such other and further relief as the Court deems just and proper.

## COUNT VIII—CONVERSION
### (Mantilla against Defendant PBC)

185.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

186.    On or about December 30, 2022, Defendant PBC intentionally prevented Mantilla from accessing his chemotherapy medication, of which Mantilla was the rightful owner.

187.    Defendant PBC illegally deprived Mantilla of his chemotherapy medication without authority to do so, by changing the locks and directing its agent to threaten calling the police, so that Mantilla could not recover said property.

188.    In doing so, Defendant PBC exercised dominion and control over Mantilla's property, depriving Mantilla of his property permanently and/or for an indefinite time.

189.    Despite demand, Defendant PBC refused to return Mantilla's property or allow Mantilla to recover same.

190.    As a result, Mantilla was forced to purchase new chemotherapy medication in order to continue his life-saving cancer treatment.

191.    As a direct and proximate result of Defendant PBC's wrongful, willful, and intentional misconduct, Mantilla has been damaged and will continue to suffer damages.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, hereby demands judgment against Defendant, POMPANO BEACH CLUB RECREATION CENTER, INC., for actual damages, punitive damages, attorneys' fees and costs pursuant to applicable Florida law, and for such other and further relief as the Court deems just and proper.

## COUNT IX—CIVIL CONSPIRACY
### (Mantilla and PEM against Defendants Jeannine Lesburt, Ronald Ritter, Pamela Tobias, and Edith Ignozzi)

192.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

193.    Defendants Lesburt, Ritter, Tobias, and Ignozzi (collectively, the "Conspirators") knowingly and willfully conspired and agreed amongst themselves to commit unlawful,

fraudulent, and deceptive acts,[3] namely, to temporarily and/or permanently deprive Mantilla and PEM of their rightful and lawful possession of various items of property to which they owned title.

194.    More specifically, on or around December 30, 2022, the Conspirators agreed to prevent Mantilla from accessing his personal effects within the Restaurant by directing its agents to change the locks and threaten to call the police should Mantilla attempt entry.

195.    The Conspirators knew Mantilla and PEM were the rightful owners of various items of personal property within the Restaurant.

196.    The Conspirators knew it had no right to prevent Mantilla from accessing his and PEM's personal property within the Restaurant.

197.    The Conspirators' willful, wanton, and malicious directive for its agents to change the lock and threaten to call the police were done in furtherance of the conspiracy between the Conspirators.

198.    As a direct and proximate result of the Conspirators' conspiracy, Mantilla and PEM have suffered substantial losses and damages in an amount to be determined according to proof.

---

3.    This is not the only conspiracy the Conspirators entered into. They also knowingly and willfully conspired and agreed amongst themselves to commit unlawful, fraudulent, and deceptive acts, namely, to commit perjury regarding the events surrounding December 28–30, 2022. More specifically, on or around March 22, 2023, the Conspirators held a PBC Board meeting to discuss their strategy going forward in the instant action. The PBC Board meeting was held on the grounds of the Pompano Beach Club Recreation Center. Resident(s) who intended to use the gym that day could—and did—overhear the words uttered during the meeting. During one such utterance that was overheard by a resident, Defendant Lesburt commanded the other Conspirators that each PBC Board member must get their stories straight in order to defeat the instant imminent lawsuit. Upon information and belief, the other Conspirators all agreed. Said differently, the other Conspirators explicitly and/or tacitly agreed to commit perjury by agreeing amongst themselves to lie under oath about, *inter alia*, Defendant Lesburt's racist tirade. However, this cause of action may not be properly brought until an overt act has been committed, that is, until such time as perjury has been committed. Should this overt act ultimately be committed, Plaintiffs intend on amending their Complaint to reflect same.

**WHEREFORE**, Plaintiffs, ARMANDO MANTILLA and PASTA E MARE, CO., respectfully request judgment in their favor and against Defendants JEANNINE LESBURT, RONALD RITTER, PAMELA TOBIAS, and EDITH IGNOZZI, for actual damages, compensatory damages, presumed damages, emotional distress damages, and such other and further relief as is deemed proper by this Court.

## COUNT X— VIOLATION OF § 772.104, FLORIDA CRIMINAL PRACTICES ACT (EXTORTION)
### (Mantilla against Defendant PBC)

199.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth at herein.

200.    "Whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, shall be guilty of a felony of the second degree . . . ." Fla. Stat. § 836.05 (defining threats and extortion).

201.    Said concisely, extortion is a "threat[] to expose another for  the commission of any crime or offense for one's own pecuniary advantage." *Berger v. Berger*, 466 So. 2d 1149, 1150–51 (Fla. 4th DCA 1985).

202.    Section 772.104(1), *Florida Statutes*, provides a civil remedy for extortion.

203.    On January 19, 2023, Defendant PBC (through legal counsel) issued a Letter to Mantilla accusing Mantilla of "blatantly violat[ing] criminal law by secretly recording conversations with PBC's representative without their knowledge or consent." *See* **Exhibit N**.

204.    The foregoing statement threatened to expose Mantilla for the commission of a crime.

205.    Defendant PBC used legal counsel to utter the foregoing statement in order to obtain a pecuniary advantage in a prospective civil dispute.

206.    The foregoing statement was uttered maliciously, with the intent to injure Mantilla, and for the purpose of compelling Mantilla to act or to refrain from acting against his will.

207.    As a direct and proximate result of Defendant PBC's wrongful, willful, intentional, and malicious conduct, Mantilla has been damaged and will continue to suffer damages.

208.    Mantilla respectfully requests this Court enter an award of his treble actual damages pursuant to section 772.104, *Florida Statutes*, or in the alternative, $200 in minimum damages.

209.    Mantilla respectfully requests this Court enter an award of attorneys' fees and costs in his favor and against Defendant PBC, pursuant to section 772.104, *Florida Statutes*.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, respectfully requests a judgment in his favor and against Defendant POMPANO BEACH CLUB RECREATION CENTER, INC., for treble actual damages in an amount shown according to proof or $200, whichever is greater, and for any other appropriate relief necessary to make Plaintiff whole and compensate him for the violations described above, as well as reasonable attorney's fees and costs pursuant to section 772.104, *Florida Statutes*, and such other and further relief as is deemed proper by this Court.

*[THIS SPACE LEFT INTENTIONALLY BLANK]*

## COUNT XII—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Mantilla against Defendant JEANNINE LESBURT)

210.   Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

211.   On or around the dates of December 28–30, 2022, Defendant Lesburt engaged in a multitude of  intentional, abusive, willful, reckless acts, done in bad faith, and/or done with gross negligence or reckless disregard for the health and wellbeing of Mantilla. These acts included, but were not limited to:

      a)   Refusing to allow Mantilla to operate his restaurant with a Hispanic chef at the helm;

      b)   Mandating that Mantilla terminate PEM's temporary chef because the chef is Hispanic;

      c)   Mandating that Mantilla terminate PEM's permanent chef because the chef is Hispanic; and

      d)   Changing the locks to Mantilla's Restaurant so that Mantilla could not enter, thereby preventing Mantilla from accessing his chemotherapy medication.

212.   Defendant Lesburt's acts were extreme and outrageous, which, under the circumstances, went beyond all possible bounds of decency and are regarded as shocking, atrocious, and utterly intolerable in a civilized community.

213.   The aforesaid actions were of the type that Defendant Lesburt did foresee or should have reasonably foreseen would cause great emotional distress, anxiety, inconvenience, and expense, including attorneys' fees and costs of litigation, on the part of Mantilla.

214.   As a direct and proximate result of Defendant Lesburt's acts as alleged herein, Mantilla has suffered and continues to suffer emotional distress, ongoing sadness, nausea,

nightmares, irritability, nervousness, anxiety, loss of confidence, grief, sleeplessness, helplessness, hopelessness, fear, humiliation, loss of self-esteem, loss of capacity to enjoy life, and other general emotional damages, all to his detriment, in an amount to be shown according to proof.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, respectfully requests a judgment in his favor and against Defendant JEANNINE LESBURT, for emotional distress damages, punitive damages, attorneys' fees and costs pursuant applicable Florida law, and such other and further relief as is deemed proper by this Court.

### COUNT XIII—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Mantilla against Defendants PBC, Ronald Ritter, Pamela Tobias, and Edith Ignozzi)

215.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

216.    On or around the dates of December 28–30, 2022, Defendant Lesburt engaged in a multitude of  intentional, abusive, willful, reckless acts, done in bad faith, and/or done with gross negligence or reckless disregard for the health and wellbeing of Mantilla. These acts included, but were not limited to:

    a)  Refusing to allow Mantilla to operate his restaurant with a Hispanic chef at the helm;

    b)  Mandating that Mantilla terminate PEM's temporary chef because the chef is Hispanic;

    c)  Mandating that Mantilla terminate PEM's permanent chef because the chef is Hispanic; and

    d)  Changing the locks to Mantilla's Restaurant so that Mantilla could not enter, thereby preventing Mantilla from accessing his chemotherapy medication.

217. Defendant Lesburt's acts were extreme and outrageous, which, under the circumstances, went beyond all possible bounds of decency and are regarded as shocking, atrocious, and utterly intolerable in a civilized community.

218. Defendants Ritter, Tobias, and Ignozzi, as members of the PBC Board with the power to outvote President Lesburt, owed a duty of reasonable care to Mantilla to act reasonably under the circumstances.

219. Defendants Ritter, Tobias, and Ignozzi failed to act reasonably under the circumstances by actively participating in and/or rubber-stamping Defendant Lesburt's wrongful actions, and further failing to correct or remedy these wrongful actions in any way.

220. The aforesaid actions were of the type that Defendants Ritter, Tobias, and Ignozzi did foresee or reasonably should have foreseen that such actions, if unmitigated, would cause great emotional distress, anxiety, inconvenience, and other emotional damages to Mantilla; and that such negligent actions or inactions on the part of Defendants Ritter, Tobias, and Ignozzi would, and did, proximately cause Mantilla to suffer such emotional distress, anxiety, inconvenience, and other emotional distress damages.

221. Defendant PBC is vicariously liable for the negligence of its employees, including Defendants Ritter, Tobias, and Ignozzi.

222. As a direct and proximate result of Defendant Ritter, Tobias, Ignozzi, and PBC's acts and/or omissions as alleged herein, Mantilla has suffered and continues to suffer emotional distress, ongoing sadness, nausea, nightmares, irritability, nervousness, anxiety, loss of confidence, grief, sleeplessness, helplessness, hopelessness, fear, humiliation, loss of self-esteem, loss of capacity to enjoy life, and other general emotional damages, all to his detriment, in an amount to be shown according to proof.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, respectfully requests a judgment in his favor and against Defendants POMPANO BEACH CLUB RECREATION CENTER INC., RONALD RITTER, PAMELA TOBIAS, and EDITH IGNOZZI, for compensatory damages, emotional distress damages, and such other and further relief as is deemed proper by this Court.

**COUNT XIV— DEFAMATION PER SE**
**(Mantilla against Defendant Jeannine Lesburt)**

223.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

224.    Upon information and belief, on or around December 30, 2022, Defendant Lesburt made a statement to Supervisor Alexs that Mantilla was stealing items belonging to Defendant PBC from the Restaurant.

225.    A published statement is defamatory *per se* if: "(1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA 2016) (quoting *Richard v. Gray*, 62 So. 2d 597, 598 (Fla.1953)).

226.    Defendant Jeannine's statement falsely accusing Mantilla of a stealing not only charges Mantilla with committing an infamous crime, but also subjects him to hatred, distrust, ridicule, contempt, disgrace, and tends to injure him in his trade or profession.

227.    Defendant Jeannine's statement was false and she knew or should have known the statements were false when made.

228.    Defendant Jeannine's statement was made in bad faith, with malice, and with reckless disregard for the truth or falsity thereof.

229.    Defendant Jeannine made the statement with the intent to harm Mantilla's reputation or should have known the statements would harm Mantilla's reputation.

230.    Defendant Jeannine made the statement with the intent to harm Mantilla's trade and/or profession or should have known the statements would harm Mantilla's trade and/or profession.

231.    Defendant Jeannine's statement damaged Mantilla's reputation among his neighbors, peers, clients, customers, and in other personal and business relationships directly related thereto.

232.    As a direct and proximate result of the subject defamatory statement made by Defendant Jeannine about Mantilla, Mantilla has suffered: injury to his reputation; shock; anger; shame; embarrassment; humiliation; anguish; hurt feelings; and other emotional distress. These losses are either permanent or continuing in nature, and Mantilla will continue to suffer these losses in the future.

233.    As a further direct and proximate result of Defendant Jeannine's defamatory statement, Mantilla has suffered substantial losses and damages incurred in lost income, lost future income, bonuses, benefits, other compensation, and in earning capacity, in an amount to be determined according to proof.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, respectfully requests a judgment in his favor and against Defendants JEANNINE LESBURT, for presumed damages, actual damages, plus interest, costs, attorneys' fees, and such other and further relief as is deemed proper by this Court.

*[THIS SPACE LEFT INTENTIONALLY BLANK]*

## COUNT XIV— DEFAMATION PER SE
## (Mantilla against Defendant PBC)

234.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 93 above, as though fully set forth herein.

235.    On January 19, 2023, Defendant PBC's legal counsel issued a Letter to Mantilla accusing Mantilla of "blatantly violat[ing] criminal law by secretly recording conversations with PBC's representative without their knowledge or consent." *See* **Exhibit N**.

236.    It logically follows that sometime between the dates of December 30, 2022, and January 19, 2023, Defendant PBC published a false statement to its legal counsel alleging Mantilla had committed a crime.

237.    A published statement is defamatory *per se* if: "(1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA 2016) (quoting *Richard v. Gray*, 62 So. 2d 597, 598 (Fla.1953)).

238.    Defendant PBC's statement falsely accusing Mantilla of "blatantly violate[ing] criminal law by secretly recording conversations with PBC's representative without their knowledge or consent" not only charges Mantilla with committing an infamous crime, but also subjects him to hatred, distrust, ridicule, contempt, disgrace, and tends to injure him in his trade or profession.

239.    Defendant PBC's statement was false and it knew or should have known the statements were false when made.

240.    Defendant PBC's statement was made in bad faith, with malice, and with reckless disregard for the truth or falsity thereof.

241.    Defendant PBC made the statement with the intent to harm Mantilla's reputation or should have known the statements would harm Mantilla's reputation.

242.    Defendant PBC made the statement with the intent to harm Mantilla's trade and/or profession or should have known the statements would harm Mantilla's trade and/or profession.

243.    Defendant PBC's statement damaged Mantilla's reputation among his neighbors, peers, clients, customers, and in other personal and business relationships directly related thereto.

244.    As a direct and proximate result of the subject defamatory statement made by Defendant PBC about Mantilla, Mantilla has suffered: injury to his reputation; shock; anger; shame; embarrassment; humiliation; anguish; hurt feelings; and other emotional distress. These losses are either permanent or continuing in nature, and Mantilla will continue to suffer these losses in the future.

245.    As a further direct and proximate result of Defendant PBC's defamatory statement, Mantilla has suffered substantial losses and damages incurred in lost income, lost future income, bonuses, benefits, other compensation, and in earning capacity, in an amount to be determined according to proof.

**WHEREFORE**, Plaintiff, ARMANDO MANTILLA, respectfully requests a judgment in his favor and against Defendant POMPANO BEACH CLUB RECREATION CENTER, INC., for presumed damages, actual damages, plus interest, costs, attorneys' fees, and such other and further relief as is deemed proper by this Court.


*[THIS SPACE LEFT INTENTIONALLY BLANK]*

## DEMAND FOR JURY TRIAL

As to each count, Plaintiffs, PASTA E MARE CO. and ARMANDO MANTILLA,

hereby demand a trial by jury on all issues so triable.


Dated this 28th day of March, 2023.

Respectfully submitted,
By: */s/ Reid Levin*
Reid Levin, Esq.
Florida Bar No. 1038933
**Reid Levin, PLLC**
8617 Boca Glades Blvd W, H
Boca Raton, FL 33434
Email: reid@reidlevinpllc.com

*Attorney for Plaintiffs*