# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 0:23-cv-60609-RS

PASTA E MARE CO., a Florida Profit Corporation,
and ARMANDO MANTILLA, an individual,

     Plaintiffs,

v.

POMPANO BEACH CLUB RECREATION
CENTER, INC., a Florida Not-for-Profit Corporation,
JEANNINE LESBURT, an individual, RONALD
RITTER, an individual, PAMELA TOBIAS, an
individual, and EDITH "JAN" IGNOZZI, an
individual,

     Defendants,

_____/

### DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT IN ITS ENTIRETY OR, IN THE ALTERNATIVE, FOR MORE DEFINITE STATEMENT WITH SUPPORTING MEMORANDUM OF LAW

Defendants, POMPANO BEACH CLUB RECREATION CENTER, INC. ("the

Association"), JEANNINE LESBURT,  RONALD RITTER, PAMELA TOBIAS and EDITH

"JAN" IGNOZZI (the individual Defendants are hereinafter collectively referred to as "Defendant

Board Members"), pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure,

and in accordance with Rule 7.1 of the Local Rules for the Southern District of Florida, hereby file

this Motion to Dismiss Plaintiffs, PASTA E MARE CO. and ARMANDO MANTILLA's,

Complaint [D.E. 1] in its Entirety or, in the Alternative, for More Definite Statement, with

supporting memorandum of law, and in support thereof state as follows:[1]

---

[1] Simultaneously with this Motion, Defendants have filed a Motion to Strike Over Fifty (50) Scandalous Allegations in Plaintiffs' Complaint.

**Cole, Scott & Kissane**
www.csklegal.com
Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville | Tampa
Bonita Springs | Naples | Pensacola | Fort Myers | Tallahassee | Key West

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

"In pleading, as in many aspects of life, quality matters more than quantity." *Lawrie v. Ginn Dev. Co., LLC*, 656 F. App'x 464 (11th Cir. 2016).  Here, Plaintiffs have launched a 44-page barrage of derogatory allegations in the Complaint, attempting to assert at least fifteen (15) causes of action against <u>volunteer</u> Board members of a condominium recreational center, all based upon a simple contractual transaction.  However, despite Plaintiffs' unwieldy, everything-but-the-kitchen-sink approach to pleading, Plaintiffs' claims fail to state a cause of action.  The Complaint lacks, among other things, the quality of pleading demanded by Rules 8 and 10 of the Federal Rules of Civil Procedure and is an impermissible "shotgun" pleading. *See e.g., Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015).  Thus, dismissal is appropriate.

Further, Plaintiffs' Complaint is replete with scandalous and immaterial allegations rising to such a level that dismissal of Plaintiffs' *entire* Complaint is warranted, as the Complaint cannot reasonably be corrected by simply striking the numerous improper allegations. A cursory review of Plaintiffs' "Introduction" alone, reveals that Plaintiffs have used the federal court system as a forum to disparage and harass the Defendant Board Members in the public record.[2]   Indeed, Plaintiffs use the word "racist" eleven (11) times throughout the Complaint.  These allegations are immaterial, improper, and serve <u>no purpose</u> other than to inflame and prejudice the trier of fact.

Moreover, Plaintiffs' unwieldy Complaint is replete with legal conclusions masquerading as factual contentions.  As such, Plaintiffs' claims fail to state a cause of action, by failing to meet

---

[2] *See e.g.,* Compl. at 2 (wherein Plaintiffs begin the Complaint by calling it a "*racist breach of contract case*") (emphasis in original); Compl. at 3 (stating, "[t]hey humiliated him. They defamed him. They stole from him. They took away his livelihood. And they weren't finished"); Compl. ¶ 44. (stating that "President Lesburt wasted no time before launching into a deplorable racist and xenophobic tirade").  The foregoing are mere examples of the numerous scandalous allegations that permeate the Complaint.  Moreover, while Defendants assert that the best recourse to correct these allegations is to dismiss the Complaint *in its entirety*,  Defendants have nonetheless filed a separate Motion to Strike requesting that this Court strike <u>over fifty (50)</u> improper allegations from the Complaint.

the well-established standards set forth in *Twombly* and *Iqbal*. To that end, eight (8) of Plaintiffs' claims warrant dismissal *with prejudice,* as they do not state a viable cause of action and cannot reasonably be amended to do so. Specifically, Plaintiffs' claims for: 1) Violation of Florida's Private Whistleblower Act (Count IV); 2) Tortious Interference with Contract (Count V); 3) Tortious Interference with Prospective Business Relations (Count VI); 4) Defamation *Per Se* (two separate counts[3]); 5) Violation of Florida Criminal Practices Act (Count X); 6) Conversion (Count VIII); and 7) Civil Conspiracy (Count IX), should all be dismissed with prejudice.

Accordingly, Defendants request, pursuant to Rules 8, 10, and 12(e) of the Federal Rules of Civil Procedure, that the Complaint be dismissed in *its entirety*, that certain claims (addressed in more detail below) be dismissed *with prejudice,* and as it pertains to any claims not dismissed with prejudice, that Plaintiffs be required to file a more definite statement containing: 1) ***"discrete and succinct,"*** numbered paragraphs limited to a single transaction or occurrence; 2) separate counts for each separate cause of action Plaintiffs are attempting to assert against each Defendant– in other words, no commingled claims; and 3) no scandalous, immaterial or otherwise improper allegations, including, no derogatory remarks or improper emphasis intended to inflame a potential jury.[4] Further, Defendants respectfully request the opportunity to present these voluminous arguments by way of oral argument, should this Honorable Court deem it necessary.

---

[3] Plaintiff's Complaint appears to contain a scriveners' error, referring to both Defamation *Per Se* Claims on pages 27 and 29 as "Count VI."

[4] According to the Eleventh Circuit, a defendant faced with a shotgun pleading should "move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 366, 77. In fact, even when a defendant fails to do so, the district court ought to take the initiative to dismiss or strike the shotgun pleading and give the plaintiff an opportunity to replead. *See Wagner v. First Horizon Pharm. Corp.,* 464 F.3d 1273, 1280 (11th Cir.2006) ("Given the district court's proper conclusions that the complaint was a shotgun pleading and that plaintiffs' [sic] failed to connect their causes of action to the facts alleged, the proper remedy was to order repleading *sua sponte.*").

## RELEVANT FACTUAL BACKGROUND

1.      Defendant, Pompano Beach Club Recreation Center, Inc. ("PBC") or ("the Association"), is a not-for-profit corporation organized under the laws of Florida. *See* Compl. ¶ 3.

2.      Defendant PBC is managed and operated by a Board of Governors ("the Board"), consisting of eight members: a President, Vice President, Treasurer, Secretary, two (2) Governors and two alternates. *Id.* ¶ 19.

3.      The Association, through its duly elected Board of Governors, is responsible for managing a recreation center located in Pompano Beach, Florida, which serves residents of two condominiums, Pompano Beach Club North and Pompano Beach Club South. *Id.* ¶ 18-20.

4.      Defendant, Jeannine Lesburt, referred to by Plaintiff as "President Lesburt" is the President of PBC's Board of Governors. *Id.* ¶ 4.

5.      Defendant, Ronald Ritter, referred to by Plaintiff as "VP Ritter Lesburt" is the Vice President of PBC's Board of Governors. *Id.*  ¶ 5.

6.      Defendant, Pamela Tobias, referred to by Plaintiff as "Treasurer Tobias" is the Treasurer of PBC's Board of Governors. *Id.* ¶ 6.

7.      Defendant, Edith "Jan" Ignozzi, referred to by Plaintiff as "Secretary Lesburt" is the Secretary of PBC's Board of Governors. *Id.* ¶ 7.

8.      Plaintiff, Jose Mantilla ("Mantilla"), is a tenant within the Community, currently residing in the Pompano Beach Club South building. *See id.* ¶ 21.

9.      Plaintiff, Pasta E. Mare ("PEM"), is for-profit corporation organized under the laws of Florida that attempted to operate a restaurant within PBC's recreation center. *Id.* ¶ 1.

10.     Plaintiff, Mantilla, is the owner and operator of PEM. *Id.* ¶ 17.

11.     The crux of Plaintiffs' Complaint involves a licensing agreement between PBC and PEM providing PEM with a license to operate a restaurant within PBC's recreation center.  *See generally* Compl.; *see also* Ex. "C," to Complaint, "Licensing Agreement."

## LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A plaintiff must recite "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

Moreover, while the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 555.   "[I]f allegations are indeed more conclusory than factual, then the court does not have to assume their truth."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)); *see also, Iqbal,* 556 U.S. at 678 (explaining the Rule 8(a)(2) pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").   Accordingly, "[u]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Iqbal,* 556 U.S. at 678.

In addition, pursuant to Rule 10, the allegations supporting a claim must be made in separate paragraphs "each limited as far as practicable to a single set of circumstance," and "[i]f

doing so would promote clarity, each claim founded on a separate transaction or occurrence ...

must be stated in a separate count or defense." Fed. R. Civ. P. 10(b).  Thus, "discrete claims should

be plead in separate counts."  *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).  As stated

by the Eleventh Circuit, Rules 8 and 10 work together,

> to require the pleader to present his claims ***discretely and succinctly***, so that his
> adversary can discern what he is claiming and frame a responsive pleading, the
> court can determine which facts support which claims and whether the plaintiff has
> stated any claims upon which relief can be granted, and, at trial, the court can
> determine that evidence which is relevant and that which is not.

*Fikes v. City of Daphne*, 79 F.3d 1079, 1082 (11th Cir. 1996) (emphasis added) (citing *T.D.S. v.

Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1543 n. 14 (11th Cir.1985) (Tjoflat, J., dissenting).

<u>**MEMORANDUM OF LAW AND ARGUMENT**</u>

**I.   <u>PLAINTIFFS' COMPLAINT IS A "SHOTGUN" PLEADING AND SHOULD BE
DISMISSED IN ITS ENTIRETY FOR FAILURE TO MEET WELL-ESTABLISHED
PLEADING STANDARDS.</u>**

**A.   <u>Memorandum on "Shotgun" Pleadings</u>**

Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly

referred to as "shotgun" pleadings. *See, e.g., Paylor v. Hartford Fire Ins. Co.,* 748 F.3d 1117, 1125

n. 2 (11th Cir.2014) (citing twenty-one published opinions condemning "shotgun pleadings"); *see

also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 367 (11th

Cir.1996) ("Experience teaches that, ***unless cases are pled clearly and precisely, issues are not

joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants

suffer, and society loses confidence in the court's ability to administer justice***.") (emphasis

added).   The Eleventh Circuit has been explicit in expressing its displeasure of "shotgun"

pleadings.  *See, e.g., Cook v. Randolph County*, 573 F.3d 1143, 1151 (11th Cir. 2009) ("We have

had much to say about shotgun pleadings, none of which is favorable.") (collecting cases).

The first published opinion to discuss shotgun pleadings in a meaningful way (albeit in a dissenting footnote) described the problem with shotgun pleadings as follows:

> The purpose of these rules is self-evident, to require the pleader to present his claims **discretely and succinctly**, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not. **"Shotgun" pleadings, calculated to confuse the "enemy," and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by the [spirit], if not the [letter], of these rules**.

*T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520, 1544 n.14 (11th Cir.1985) (Tjoflat, J., dissenting) (emphasis added) (describing the complaint at issue as "a paradigmatic shotgun pleading, containing a variety of contract and tort claims interwoven in a haphazard fashion").

*T.D.S.* was the Eleventh Circuit's "first shot" in what became "a thirty-year salvo of criticism aimed at shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015) (discussing *T.D.S. Inc.* and citing a non-exhaustive list of cases that have addressed this topic).  Later, in *Weiland*, the Eleventh Circuit examined over sixty published decisions on shotgun pleadings since the *T.D.S.* decision and identified the following four (4) "rough" types or categories of shotgun pleadings: 1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts;" 2) a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" 3) a complaint that does not "separate[e] into a different count each cause of action or claim for relief;" and 4) a complaint "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1321-22 (internal footnotes with citations omitted).

**B.** **Plaintiffs' Complaint Contains Numerous Conclusory, Immaterial, Scandalous and Argumentative Allegations, and Is Otherwise Drafted in a Haphazard and Commingled Manner, Warranting Summary Dismissal as a "Shotgun" Pleading.**

The instant Complaint is a classic "shotgun" pleading.  Plaintiffs' Complaint has committed almost every single "sin" identified by the Eleventh Circuit in *Weiland*.  *Id.* at 1321-22.  First, upon a cursory review of Plaintiffs' Complaint, it is indisputable that it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id. See also* Compl.  Indeed, Plaintiffs' Complaint contains such a surprising amount of immaterial and improper allegations, that Defendants were compelled to file a separate Motion to Strike requesting that this Court strike over fifty (50) allegations.  Below are just *some* examples of the immaterial and improper allegations in Plaintiffs' 44-page, 245 paragraph Complaint:

1. "We begin with what this case *is* and what it is *not*. This is a *racist breach of contract case.*" Compl. at 2, Introduction (emphasis in original).

2. "As Mantilla later exclaimed, 'I feel run over, harassed in my name, and outraged in my rights as a person and as a professional.' They humiliated him. They defamed him. They stole  from him. They took away his livelihood. And they weren't finished."  Compl. at 3, first un-numbered paragraph.

3. "President Lesburt wasted no time before launching into a deplorable racist and xenophobic tirade." Compl. ¶ 44.

4. "President Lesburt, taken over by her unrelenting discriminatory animus, boiled into a sudden, shouting rage: '**I WANT TO BE VERY CLEAR. I DON'T WANT ANY HISPANICS IN THAT KITCHEN. PERIOD.**'" Compl. ¶ 51 (emphasis in original).

5. "Defendant PBC's motto, 'Where you should be,' apparently does not apply to Hispanic and non-native English speaking chefs." Compl. ¶ 58.  "Defendant PBC's motto, 'Where you should be,' apparently does not apply to those who hire Hispanic and non-native English speaking chefs either." Compl. ¶ 59.

6. "He was humiliated and treated like a second-class citizen. But Defendant PBC was not done."  Compl. ¶ 82.

7. "*[THIS PARAGRAPH LEFT INTENTIONALLY BLANK TO ALLOW THE PRIOR PARAGRAPH TO SINK IN].*"  Compl. ¶ 90 (emphasis in original).

Most unfortunately, the above quotations are just a *few* examples of the numerous distasteful allegations in Plaintiffs' Complaint that are in direct contravention to Rules 8 and 10; allegations which are clearly immaterial, conclusory, argumentative, and replete with hearsay. Indeed, Plaintiffs use the word "racist" a total of eleven (11) times. Such allegations – *e.g.,* that Defendants engaged in a "deplorable racist and xenophobic tirade" and that Plaintiff Mantilla was "humiliated and treated like a second-class citizen" – have no place in the pleadings and are wholly prejudicial to the Defendants. Additional remarks such as, "Oh, the *audacity*" and "*[THIS PARAGRAPH LEFT INTENTIONALLY BLANK TO ALLOW THE PRIOR PARAGRAPH TO SINK IN]"* are likewise argumentative, immaterial, and improper, yet the Complaint is replete with vexatious remarks of this nature. Compl. at 2; ¶ 92; and ¶ 90. Plaintiffs have certainly not pleaded their claims "***discretely and succinctly***," but in a manner which can only be considered a deliberate attempt to prejudice Defendants before the trier of fact. Accordingly, these allegations permeate the Complaint to such an extent that dismissal of the *entire* Complaint is warranted.

Second, multiple counts in Plaintiffs' Complaint are commingled against multiple defendants or include multiple causes of action within one count. As such, these counts are improperly pled. Indeed, a complaint that does not "separate[e] into a different count each cause of action or claim for relief" or that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against" is improperly commingled and subject to dismissal. *See Weiland*, 792 F.3d 1321-22 (internal footnotes with citations omitted); *see also,* Fed. R. Civ. P. 10(b). Beginning with Count I, both Plaintiffs have attempted to assert one (1) count against corporate Defendant PBC for: 1) race discrimination; 2) associational race discrimination; and 3) retaliation. *See* Compl. at Count I at 17. Each of the foregoing claims, however, constitute their

own cause of action, and thus, must be pled in separate counts.[5]  At a minimum, Plaintiffs should

be required to replead each discrimination and/or retaliation claim *separately*, bringing forth a

count for each Plaintiff, each cause of action, and identifying the actions or conduct each Plaintiff

was subjected by each Defendant to in support their respective claims.   Additionally, in Counts

VI and XIII, Plaintiffs attempt to assert one (1) count for tortious interference and one (1) count

for negligent infliction of emotional distress against multiple defendants, respectively.  *See id.*

Clearly, these counts "assert multiple claims against multiple defendants without specifying which

of the defendants are responsible for which acts or omissions," in direct contravention to Rule 10.

Accordingly, due to Plaintiffs' failure to specify which Defendant engaged in what conduct, each

Defendant is not placed on notice of, nor afforded the opportunity to respond to, the specific claims

and conduct against that particular Defendant.  Thus, Counts I, VI and XIII should be dismissed.[6]

For these reasons, it is evident that Plaintiffs have attempted to assert a barrage of claims

interwoven in a haphazard fashion, containing numerous immaterial, redundant, and scandalous

allegations, constituting a "shotgun" pleading.  Thus, dismissal of the *entire* Complaint is

warranted, and Plaintiffs should be required to replead their case in a "discrete and succinct"

manner as to "promote clarity," as required by the Federal Rules of Civil Procedure.[7]  Allowing

such a wieldy Complaint to proceed would not further the interests of justice, but would cause a

---

[5] *See Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir. 1986) (recognizing a *separate* claim for associational discrimination); *see also, Brown v. Wrigley Mfg. Co., LLC*, No. 21-11328, 2023 WL 2386500, at *7 (11th Cir. Mar. 7, 2023).

[6] *See, e.g., Magluta v. Samples,* 256 F.3d 1282, 1284 (11th Cir. 2001) ("The complaint is replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the fourteen defendants charged, though geographic and temporal realities make plain that all of the defendants could not have participated in every act complained of."); *Ebrahimi v. City of Hunstville Bd. of Educ.,* 114 F.3d 162, 164 (describing a complaint that "offered vague and conclusory factual allegations in an effort to support a multiplicity of discrimination claims leveled against 15 defendants" as a "prototypical 'shotgun complaint' ").

[7] *See T.D.S. Inc.,* 760 F.2d at 1544 n.14 (Tjoflat, J., dissenting) ("'Shotgun' pleadings, calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by the [spirit], if not the [letter], of these rules.").

chaotic docket; discovery would not be controlled, the trial court's docket will become unmanageable, the litigants will suffer, and ultimately, "society loses confidence in the court's ability to administer justice." *Weiland*, 792 F.3d 1313, 1320–23. Thus, Defendants request, pursuant to Rules 8, 10, and 12(e), that the Complaint be dismissed in its *entirety* and, as it pertains to any claims dismissed *without prejudice*, that Plaintiffs be required to file a more definite statement specifically containing: 1) "***discrete and succinct***" paragraphs; 2) numbered paragraphs limited to a single transaction or occurrence; 3) separate counts for each cause of action each Plaintiff intends to assert against each Defendant, i.e., no commingled claims; and 4) no scandalous, immaterial or otherwise improper allegations. Defendants specifically request that this Court order Plaintiffs to refrain from making any prejudicial remarks, including improper emphasis on certain words, in what is a clear attempt to inflame a potential jury.

## II. PLAINTIFF'S CLAIM FOR VIOLATION OF FLORIDA'S PRIVATE WHISTEBLOWER ACT (COUNT IV) SHOULD BE DISMISSED WITH PREJUDICE, FOR FAILURE TO STATE A CAUSE OF ACTION.

Although Plaintiffs have taken an unwieldy, everything-but-the-kitchen-sink approach to pleading, Plaintiffs cannot have their cake and eat it too. As stated by Plaintiffs in their Introduction, "this is a [] breach of contract case." Compl. at 2. This is *not* a case involving an employee subjected to retaliation by his employer. Rather, this case involves a licensing agreement between two entities, PBC and PEM. Mantilla, the alleged "employee" at issue is truly the "owner, operator, manager, and the veritable face of PEM." *Id.* ¶ 17. Accordingly, Mantilla is certainly not an "employee" of PBC, and the specific and indisputable language of the parties' licensing agreement, attached as Exhibit "C" to the Complaint, makes this clear.[8]

---

[8] As an initial matter, a district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls. *See, e.g., Crenshaw v. Lister,* 556 F.3d 1283, 1292 (11th Cir.2009) (citing cases). Indeed, it is the law in this Circuit that "when the exhibits contradict the general and conclusory allegations of the pleading, the

The contract at issue is a Licensing Agreement between Plaintiff, PEM (referred to in the Licensing Agreement as the "Operator), and Defendant, PBC. *See* Compl. at Exhibit "C," at 1. Pursuant to the parties' Licensing Agreement, PBC:

> grant[ed] to Operator a <u>limited and revocable right (the "License")</u> to provide food and beverage services (such services collectively referred to herein as the "Services") at the Premises to the residents of the adjacent condominium buildings . . . Operator expressly understands and agrees that this Licensing Agreement simply provides Operator with a limited and revocable right to provide Services at the Premises and does not provide Operator with any possessory interests and/or estate in and to the Recreation Building and/or the Premises.

*Id.* at ¶ 2. Furthermore, and of significance to the instant Motion, as it pertains to the relationship between PEM and PBC, the Licensing Agreement specifically states in pertinent part:

> **18.    Relationship of the Parties; Reserved Rights.**
>
>          (a)    Notwithstanding anything contained in this Agreement to the contrary or any actions of either Party or any circumstances related to and/or arising in connection with Services hereunder, the Operator is an independent contractor and will in no event be considered an employee, partner or joint venturer of Association.  As such, except as otherwise expressly set forth in this Agreement, nothing contained in this Agreement shall authorize, empower or constitute the Operator as an agent of Association in any manner; authorize or empower the Operator to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of Association; and/or authorize or empower the Operator to bind the Association in any manner or make any representation, warranty, covenant, agreement or commitment on behalf of Association.  Furthermore, the Operator expressly acknowledges and agrees that the Association will not withhold or pay any kind of employment and/or payroll taxes on behalf of the Operator and that the Operator is solely responsible for the payment of the Operator's own taxes.

Compl. at Exhibit "C," Section 18(a), at 15. Thus, the Licensing Agreement unequivocally establishes that Operator is an "**independent contractor and will in no event be considered an employee … of the Association**." *Id.* (emphasis added).  The Licensing Agreement also provides:

---

exhibits govern." *Id.* (quoting *Griffin Industries, Inc. v. Irvin,* 496 F.3d 1189, 1206 (11th Cir.2007)); *see also, Simmons v. Peavy–Welsh Lumber Co.,* 113 F.2d 812, 813 (5th Cir.1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.")

> 8.      **Operator Personnel.**
>
>         (a)      **Personnel.** The Operator, at its own costs and expense, shall employ no less than the minimal number of personnel (each a "Staff Employee" and collectively, the "Staff Employees") as are required to provide the Services, as such number is determined by the Operator and approved by the Association in its reasonable discretion. The Operator and its Staff Employees shall comply with all rules and regulations governing access to and conduct at the Recreation Building and/or the Premises. The Operator shall maintain and deliver to the Association an updated list of each Staff Employee providing Services at the Recreation Building and/or the Premises; in connection therewith, the Operator agrees to provide the Association with immediate written notice of any Staff Employee who is no longer performing services on behalf of Operator pursuant to this Agreement. Moreover, the Operator covenants to the Association that the Operator will not employ any Staff Employee who cannot pass a standard background check which is commonly used in the industry by qualified and reputable food and beverage service providers. Furthermore, the Parties expressly understand and agree that the Staff Employees are not employees of the Association, and as such, no Staff Employee shall be entitled to any compensation and/or benefits of any kind from the Association. Moreover, the Operator shall use its best efforts to hire competent, dedicated and long-term personnel with the understanding that it is of great importance to Residents to deal with familiar faces and relationships when utilizing the Services.

Compl. at Exhibit "C," Section 8(a), at 8. Once again, the Parties expressly agreed that PEM's "Staff Employees **are not** employees of the Association." *Id.* (emphasis added). It also bears to note, Mr. Mantilla executed the Licensing Agreement on PEM's behalf as "Operator." *Id.* at 21.

Now, Mantilla, in his individual capacity, has alleged that he is an "employee" of PBC in order to avail himself of Fla. Stat. § 448.102(3), which provides that: "[a]n **employer** may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3) (emphasis added). However, Fla. Stat. § 448.102(2) defines an "[e]mployee" as "a person who performs services for and under the control and direction of an employer for wages or other remuneration. **The term *does not* include an independent contractor**."[9] *Id.* Recognizing that the express terms of the Licensing Agreement provide that PEM is an independent contractor of PBC, Plaintiff alleges in conclusory fashion that, somehow, "Defendant PBC maintained such control over Mantilla (and PEM) that the relationship

---

[9] "Employer" is defined as "any private individual, firm, partnership, institution, corporation, or association that employs ten or more persons." Fla. Stat. § 448.102(3). Notably, Plaintiff has not included any facts to support that PBC is an "employer" as defined by Fla. Stat. § 448.102(3).

can only be characterized as an employer-employee relationship." Compl. ¶ 147. Plaintiff, however, cannot plead his way around the express terms of the Licensing Agreement and the requirements of Fla. Stat. § 448 by reciting formulaic legal conclusions.[10] It is not enough for Mantilla to merely claim he is an "employee" of PBC and recite legal conclusions (i.e., that PBC purportedly exercised "control" over him) to support his claims. He **must** point to specific facts. Plaintiff has not pointed to **_any_** fact that could support his claim that PBC exercised any type of "control" over Mantilla, let alone overcome the explicit language of the Licensing Agreement. On the contrary, the allegations describing Mantilla's status and relationship with PEM and PBC directly contradict the position he attempts to take. He is certainly not an "employee;" not of PEM, let alone of PBC. Rather, he is a "nine-time restauranter with restaurants in Florida, Colombia, and Venezuela" and the "***owner, operator, manager, and the veritable face of PEM***," whose duties include "managing all day-to-day operations, purchasing supplies, menu design, recipe preparation, supervising staff, and running the business in all material aspects." Compl. ¶ 17 (emphasis added). He repeatedly refers to PEM as "***his restaurant***." *Id.* ¶ 24 ("Mantilla told the PBC Board the name of ***his restaurant*** would be.'') (emphasis added).

Simply put, Mantilla is certainly **_not_** an "employee" – not of PEM or PBC – and Plaintiff's threadbare, legal conclusion that PBC exercised "control" over him cannot overcome the *explicit written terms* of the parties' Licensing Agreement, which unequivocally states that <u>PEM</u> is an **<u>independent contractor</u>** of PBC. As Mantilla's allegation that he is an "employee" of PBC "[is] indeed more conclusory than factual, then the court does not have to assume [its] truth." *Chaparro*, 693 F.3d at 1337.[11] Thus, as Mantilla is not an employee of PBC and cannot amend to assert

---

[10] Legal conclusions masked as factual contentions <u>cannot</u> overcome the pleading standards recognized by the Supreme Court. *See Iqbal*, 556 U.S. 662; *Twombly*, 550 U.S. 544, 555.

[11] *See also, Day v. Taylor*, 400 F.3d 1272, 1277 (11th Cir. 2005) (affirming dismissal of Sherman Act claims at motion to dismiss stage upon concluding that relationships at issue were agency relationships, stating, "[w]e are not bound by

otherwise, Plaintiff's cause of action for Violation of Florida's Private Whistleblower Act, should be dismissed *with prejudice*, and PBC respectfully requests recovery of its reasonable attorney's fees and court costs incurred pursuant to Fla. Stat. § 448.102.

**III.** **PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS (COUNTS V AND VI) FAIL TO STATE A CAUSE OF ACTION AND SHOULD BE DISMISSED WITH PREJUDICE**

   **A.** **Plaintiff's Tortious Interference Claim Against President Lesburt (Count V) Fails as a Matter of Law Because President Lesburt Cannot Be a "Stranger" to the Parties' Relationship.**

   In order to state a viable cause of action for tortious interference with a business relationship or contract, there must be an allegation of both intent to damage the business relationship and a lack of justification to take the action which caused the damage.  *See e.g., Smith v. Emery Air Freight Corp.*, 512 So. 2d 229 (Fla 2d DCA 1987); *Ellis Rubin, P.A. v. Alarcon*, 892 So. 2d 501, 503 (Fla. 3d DCA 2004).  For an interference to be considered unjustified, the interfering defendant must be a third party, or a "*stranger to the business relationship*."  *Palm Beach County Health Care Dis. v. Professional Medical Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009), *review denied*, 34 So. 3d 2 (Fla. 2010) (emphasis added).  Thus, a cause of action for tortious interference with a business or contractual relationship can exist only when there has been an interference by persons who are ***not parties*** to the business or contractual relationship. *See, e.g., Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla 3d DCA 1986).  One who "***has any beneficial or economic interest in, or control over, that relationship***" cannot be considered a "stranger" to the relationship.  *Palm Beach*, 13 So. 3d at 1094 (emphasis added). As

---

the legal conclusions in the complaint that the relationship is not an agency or that the independent dealers do not have "legal power" to act on behalf of U–Haul. We must look instead at the pleaded facts to determine whether Appellants' claim can withstand a motion to dismiss.") (citing *Davila v. Delta Air Lines*, 326 F.3d 1183, 1185 (11th Cir. 2003).

stated succinctly by the First District in *Cedar Hill Properties Corp. v. Eastern Federal Corp.*, 575

So. 2d 673, 676 (Fla. 1st DCA 1991):

> In order to maintain an action for tortious interference with contractual rights, a plaintiff must prove that a third party interfered with a contract by "influencing, inducing or coercing one of the parties . . . to breach the contract, thereby causing injury to the other party." ***An agent of a corporate party to a contract***, acting within his capacity and scope as an agent, ***cannot be considered to be a separate entity outside of the contractual relationship which can tortiously interfere with that relationship.***

(citations omitted) (emphasis added). *See also, Montgomery & Larmoyeux v. Philip Morris, Inc.*,

992 F.Supp. 1372, 1375 (S.D.Fla.1998) (stating, under Florida law, "a cause of action for tortious

interference ***cannot exist against one who is himself a party to the contract*.**") (emphasis added).

PEM's tortious interference claim against President Lesburt (Count V) is premised on

President Lesburt's alleged "interference" with PEM's and PBC's Licensing Agreement.   A

cursory review of the Complaint, however, demonstrates that Ms. Lesburt, as the President of PBC,

is in fact, an agent of the corporate party to the Licensing Agreement.  *See generally,* Compl.

Plaintiff specifically recognizes that "Defendant PBC is controlled, managed, and operated by its

duly elected Board of Governors," which includes President Lesburt.  *See* Compl. ¶ 4 and ¶ 19, ¶¶

4-7. Plaintiff describes how the Licensing Agreement was entered with PBC, *through its Board of*

*Governors*, whose "duties include …***entering into contracts with the operators of dining***

***establishments to serve food and beverages to residents*.**" Compl. ¶ 20 (emphasis added).  Further,

Plaintiff specifically acknowledges that President Lesburt is an agent of PBC.  *See* Compl. ¶ 97

(raising discrimination claims against PBC upon the actions of its *agents,* stating "[a]s members

of Defendant's PBC's Board, they are all agents of Defendant PBC")  (emphasis added). Thus, it

is indisputable that President Lesburt is an ***agent*** of PBC and cannot be a stranger to the business

relationship; on  the contrary, she is party to contract at issue.  *Cf. Cedar Hill*, 575 So. 2d at 676.

Thus, as an agent of PBC – and specifically, one of the agents who *entered into the contract with PEM on PBC's behalf* – President Lesburt "***cannot be considered to be a separate entity outside of the contractual relationship which can tortiously interfere with that relationship.***" *Id.* at 676. Accordingly, Count V should be dismissed *with prejudice.*

**B.** **Plaintiff's Tortious Interference Claim against PBC (Count VI) Also Fails as a Matter of Law Because Plaintiff Lacks Identifiable Business Relationships.**

In Count VI, PEM attempts to assert another tortious interference claim, this time against PBC and the Defendant Board Members, for "interfering" with PEM's purported "business relationship and/or prospective business relationship with many or all residents of the North and South Towers." *See* Compl. ¶ 169.  The elements of a cause of action for tortious interference with a business relationship are: 1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; 2) knowledge of the relationship on the part of the defendant; 3) an intentional and unjustified interference with the relationship by the defendant; and 4) damage to the plaintiff as a result of the breach of the relationship. *See Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985); *Ellis Rubin*, 892 So. 2d at 503. The business relationship, if not based upon an actual written contract, must be evidenced by an ***actual and identifiable*** understanding or agreement which in all probability would have been completed if the defendant had not interfered.  *See, e.g., Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 2d 812 (Fla. 1994). In other words, a cause of action for tortious interference must "***allege and prove a business relationship with an identifiable person.***"  *Ferguson Transp. v. N. Am. Van Lines*, 687 So. 2d 821, 822 (Fla. 1996).  Where a complaint fails to specifically identify the individuals with whom the defendant purportedly interfered, a tortious interference fails.  *Ethan Allen*, 647 at 814.

In Florida, no cause of action exists for tortious interference with a business's relationship to the "community at large." *Id*. at 815.  The Florida Supreme Court addressed this in *Ethan Allen*,

holding that  Georgetown could not recover, in a tortious interference with a business relationship

tort action, damages where the "relationship" was based on "speculation" regarding future sales to

past customers.  *Id.* at 814. There, Georgetown sued Ethan Allen for tortious interference with its

"customers, past, present, and future," however the Court concluded that "Georgetown's

relationship with its past customers was not one upon which a claim for tortious interference with

a business relationship could be based," because Georgetown "had no identifiable agreement with

its past customers that they would return to Georgetown to purchase furniture in the future." *Id.*

at 815 (emphasis added).  The Court stated, "[t]he ***mere hope*** that some of its past customers ***may***

***choose*** to buy again cannot be the basis for a tortious interference claim." *Id.* (emphasis added).

The Florida Supreme Court confronted this again in in *Ferguson.  See Ferguson*, 687 So.

2d at 82. There, Ferguson initially contracted with North American to be North American's

exclusive agent in Broward County. *Id.* at 821-22.   However, North American also retained

Advance Relocation as its agent in West Palm Beach, Florida, who then allegedly intruded into

Ferguson's territory in Broward County. *Id.* at 822. Ferguson brought suit against North American

and Advance Relocation, alleging they had interfered with Ferguson's unidentified Broward

County customers.  *Id.*   The Florida Supreme Court rejected Ferguson's claim for tortious

interference, holding that Ferguson's alleged business relationship with its unidentified purported

Broward County customers was insufficient to support a protectable business relationship. *Id.  See*

*also*, *Sarkis v. Pafford Oil Co.*, 697 So. 2d 524, 526 (Fla. 1st DCA 1997) (affirming trial court's

dismissal of complaint alleging defendant tortiously interfered with purported business

relationships between plaintiffs and their "customers," because "***[t]he amended complaint d[id]***

***not identify the customers who were the subject of the alleged interference.***") (emphasis added);

*Bortell v. White Mts. Ins. Grp., Ltd*, 2 So. 3d 1041, 1049 (Fla. 4th DCA 2009) (affirming trial

court's dismissal of complaint alleging defendants tortiously interfered with purported business relationships between plaintiff and a group of "finite marine clients," because the complaint did not identify with any specificity the parties with whom plaintiff claimed interference, further stating, plaintiff "alleged merely that a finite group of marine crew clients existed *without identifying any actual clients* with whom he had an agreement which in all likelihood would have been completed but for the defendant's interference.") (emphasis added).

In the instant case, like the plaintiffs in *Ethan Allen*, *Ferguson*, *Sarkis*, and *Bortell*, PEM attempts to assert a cause of action for tortious interference based upon PEM's relationship with unidentified, *prospective* customers – specifically, with potential patrons and residents who Plaintiff *could have* served. *See* Compl. ¶ 172 (stating that that the Defendants' closure "caused PEM to lose *prospective business* in the form of *patrons* at its Restaurant") (emphasis added). Plaintiff claims that "PEM and Mantilla had a business relationship and/or prospective business relationship with many or all residents of the North and South Towers, *as said residents enjoyed and/or were looking forward to dining at an establishment on Pompano Beach Club grounds*," Compl. ¶ 169 (emphasis added). Such lost patronage, however, is entirely speculative and considered a relationship with the public at large. Indeed, as recognized by the Florida Supreme Court in *Ethan Allen,* even PEM's potential "relationship" with past patrons – i.e., the patrons who may have dined at PEM within the two (2) days in which it was open – cannot serve as a basis for a tortious interference claim, as PEM "had no identifiable agreement with its past customers that they would return … in the future." *Ethan Allen*, 647 at 815. As stated best by the Florida Supreme Court, PEM's "*mere hope* that some of its past customers *may choose* to [return] cannot be the basis for a tortious interference claim." *Id.* (emphasis added). PEM's tortious interference claim simply cannot stand based on yet-to-be-formed relationships with the condominium community at

large.  Furthermore, pursuant to the Licensing Agreement, PEM would provide food and beverage services "*on behalf of Defendant PBC* to the residents in Pompano Beach Club community." Compl. ¶ 29. Thus, PBC "*cannot be considered to be a separate entity outside of the contractual relationship which can tortiously interfere with that relationship.*" *Cedar Hill*, 575 So. 2d at 676. For these reasons, Count VI of the Complaint should be dismissed, *with prejudice.*

### C.  Both of Plaintiff's Tortious Interference Claims Are Barred By the Independent Tort Doctrine.

As stated by Plaintiffs, "this is a [] breach of contract case." Compl. at p.2.  Corporate Plaintiff PEM describes how it entered a contract with PBC *through its Board of Governors*, whose "duties include … entering into contracts with the operators of dining establishments to serve food and beverages to residents." Compl. ¶ 20.  PEM specifically recognizes that "Defendant PBC is controlled, managed, and operated by its duly elected Board of Governors." *Id*. ¶ 19, ¶¶ 4-7. Accordingly, based upon the Board's alleged improper termination of the Licensing Agreement, Plaintiff brought a breach of contract action against PBC.  Yet, at the same time, PEM attempts to assert tortious interference claims against PBC and its Board Members; the same entities and individuals that entered into the Licensing Agreement.  "Under Florida's independent tort doctrine, it is well settled that a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims." *Yuken Corp. v. Gedcore LLC*, No. 22-20661-CIV, 2022 WL 3701233, at *3 (S.D. Fla. June 21, 2022).  The doctrine's impetus stems from "[f]undamental contractual principles ... [that] bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *Freeman v. Sharpe Res. Corp.*, No. 6:12-cv-1584, 2013 WL 2151723, at *8 (M.D. Fla. May 16, 2013) (citing *Tiara Condo. Association, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408 (Fla. 2013)). Thus, the independent tort doctrine bars tort actions between parties in contractual privity when one party seeks to recover

purely economic damages in tort for matters arising from the parties' contract.  *See, e.g., Certain Underwriters at Lloyd's of London, UK Subscribing to Pol'y No. B1230AP56189A14 v. Ocean Walk Resort Condo. Ass'n, Inc.*, No. 616CV258ORL37GJK, 2017 WL 3034069, at *10 (M.D. Fla. July 18, 2017) (citing *Tiara*, 110 So.3d at 409-10).[12]  Once again, Plaintiff cannot have his cake and eat it too.  The facts supporting PEM's tortious interference claims are ***indistinguishable*** from those supporting its breach of contract claim.  Thus, PEM's tortious interference claims must fail.

## IV.   PLAINTIFFS' DEFAMATION *PER SE* CLAIMS SHOULD BOTH BE DISMISSED WITH PREJUDICE FOR FAILURE TO STATE A CAUSE OF ACTION.

Plaintiff Mantilla has attempted to assert two (2) defamation *per se* claims.[13]  The first, against Defendant, Jeannine Lesburt, is premised upon a purported statement made by President Lesburt to PBC's employee, i.e., "Supervisor Alex."  Compl. ¶ 224.  The second, against PBC, appears to be based upon PBC's communication to its attorney.  As explained herein, both defamation *per se* claims fail to state a cause of action and must be dismissed *with prejudice*.

### A.  Applicable Florida Law Governing Defamation Claims.

Because the alleged defamation occurred in Florida, Florida state law is controlling.  *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015).  To that end, to maintain a defamation claim under Florida law, a plaintiff must establish that: "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to another." *Id.* at 865.[14]  It is undisputed that an essential element of defamation is

---

[12] In *Tiara*, Justice Pariente explained that the majority's decision did not upset the principle that tort claim must be independent of any breach-of-contract claim. *Tiara*, 110 So.3d at 409-10. The 11th Circuit has continued to recognize this independence requirement. *See, e.g., CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, 2018 WL 905752, at *10 (M.D. Fla. Feb. 15, 2018).

[13] As mentioned above, certain of Plaintiffs' counts are improperly labeled; both of Plaintiffs' Defamation *Per Se* claims are labeled "Count XIV."

[14] A published statement is defamatory *per se* if: "(1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Richard v. Gray*, 62 So. 2d 597, 598 (Fla.1953)).

publication to a <u>third party</u>.  *See, e.g., Hullick v. v. Gib. Private Bank & Trust Co.*, 279 So. 3d 809, 810 (Fla. 4th DCA. 2019);  *Advantage Pers. Agency, Inc. v. Hicks & Grayson, Inc.*, 447 So. 2d 330, 331 (Fla. 3d DCA 1984).  Indeed, "a defamatory statement does not become actionable . . . until it is published or communicated to a <u>third person</u>."  *Am. Airlines, Inc. v. Geddes*, 960 So. 2d 830, 833 (Fla. 3d DCA 2007) (citing *American Ideal Mgmt., Inc. v. Dale Village, Inc.*, 567 So. 2d 497, 498 (Fla 4th DCA 1990) (emphasis added)).  Moreover, when the entity alleged to have committed defamation is a <u>corporation</u>, Florida courts have held that statements made to corporate executive or managerial employees of that entity are, in effect, <u>made to the corporation itself</u> and lack the essential element of publication.  *See, e.g., Lopez v. Ingram Micro, Inc.,* 10 Fla. L. Weekly D635 (S. D. Fla. Mar 18, 1997).  Accordingly, "intra-corporate communications" are <u>not</u> "published" for purposes of defamation.  *Hoch v. Loren*, 273 So. 3d 56, 57 (Fla. 4th DCA 2019).

In *Geddes*, for example, the Third District Court of Appeal explained that, with respect to corporations, "statements made to corporate executive or managerial employees of that entity are, in effect, being made to the corporation itself, and thus lack the essential element of <u>publication</u>." 960 So. 2d at 833 (emphasis added).  *Geddes* involved: 1) communications between an employer's executive and managerial employees, which the Third District determined lacked <u>publication</u> to a third party; and 2) statements made by executive and managerial employees to non-managerial personnel, which the Third District found to be privileged.  *See id.*  Similarly, in *Hullick*, the Fourth District Court of Appeal was faced with the issue of whether publication to a third party occurred when Gibraltar's CEO and Chairman of Gibraltar's Board of Directors allegedly made defamatory statements to other members of the Board.  *See Hullick*, 279 So. 3d at 812. The Fourth District ultimately upheld summary judgment in favor of the defendant explaining that  "communications among the Board and [its Chief Executive Officer] were tantamount to the '**corporation talking**

to itself.'" *Id.* (citing *Geddes*, 960 So. 2d at 834) (emphasis added). The Fourth District Court of

Appeal further explained the rationale behind treating certain intra-corporate communications as

<u>not</u> published for the purposes of a defamation claim in *Hoch v. Loren*, stating:

> [t]o reach this conclusion, courts have employed the legal fiction that the party
> hearing or seeing the purported defamation is ***so closely connected*** with the
> potential defamation plaintiff or defendant that they merge into a single party entity,
> so there is no publication to a '**third person**' necessary to the cause of action.

*Hoch*, 273 So. 3d 56, 57 (emphasis added).

**B.**  <u>**Plaintiff's Defamation Claim Against President Lesburt Fails to State a Cause of
Action Because Lesburt's Statements Were Not Published to Any Third Party.**</u>

The first defamation claim, i.e., Mantilla's  defamation *per se* claim against President

Lesburt, on page 40, is premised upon an alleged defamatory statement made by Lesburt, PBC's

President, to PBC's Recreation Building Supervisor.  Specifically, Plaintiff alleges  that "[u]pon

information and belief, on or around December 30, 2022, Defendant Lesburt made a statement to

Supervisor Alexs that Mantilla was stealing items belonging to Defendant PBC from the

Restaurant."  Compl. ¶ 224, ¶ 226.  The individual Plaintiff refers to as "Supervisor Alexs" is the

"Recreation Building Supervisor," and thus, an agent of PBC.  Compl. ¶ 31, *see also,* Compl. ¶

42-44.  To that end, President's Lesburt's statement, even if true, cannot  constitute a "publication."

Indeed, both President Lesburt and Supervisor Alexs are agents of PBC; they consist of an

executive/director (the  Association's President) and a managerial agent (PBC's Recreation

Building Manager).   Thus, like in *Geddes,* the communication at issue was a statement between

an executive and a managerial employee.  *Cf. Geddes*, 960 So. 2d at 834   Ms. Lesburt cannot be

considered to have <u>publicly communicated</u> the alleged statement about Mr. Mantilla to Supervisor

Alexs, as they are undoubtedly "***so closely connected***" with PBC that they merge into a single

party entity; in other words, Ms. Lesburt's alleged statements to Supervisor Alexs were tantamount

to the '**corporation talking to itself**.'" *Hullick*, 279 So. 3d at 812 (citing *Geddes*, 960 So. 2d at

834).   Thus, Plaintiff has failed plead an essential element of defamation,  <u>publication to a third</u>

<u>party</u>, and cannot reasonably amend to assert otherwise.  For this reason, Plaintiff's defamation

*per se* claim against Defendant Lesburt should be dismissed, *with prejudice.*[15]

**C.   <u>Plaintiff's Defamation Claim Against PBC Also Fails to State a Cause of Action</u>**
**<u>Because PBC's Statements to Its Attorneys Were Not Published to Any Third Party.</u>**

Mantilla's second defamation *per se* claim is based upon PBC's alleged and <u>unidentified</u>

"false statement to its **legal counsel** alleging that Mantilla had committed a crime."  Compl. ¶¶

235-236 (emphasis added).  Simply put, statements from a corporation to its attorney certainly

cannot satisfy the publication element of a defamation claim.  This issue has been well established

in Florida.  *See, e.g., Maine v. Allstate Ins. Co.*, 240 So. 2d 857, 858 (Fla. 4th DCA 1970) (holding

that that statements made to the plaintiff's attorney were <u>not published</u> to a third party for purposes

of a defamation claim);  *Gomberg v. Zwick, Friedman & Goldbaum, P.A.*, 693 So. 2d 1064, 1065

(Fla. 4th DCA 1997) ("[S]ending the letter to Feinberg did not constitute publication because

Feinberg acted as appellant's attorney and received the correspondence on his behalf.").

*Hoch v. Loren* involved a very similar situation to the instant case.  *See Hoch*, 273 So. 3d

at 57 .  In *Hoch,* the defendant attorneys were hired by the board of a condominium association to

send a cease-and-desist letter to a unit owner.  *Id.*  The unit owner took offense at the content of

the letter and sued the attorneys for defamation for copying their client.  *Id.*  The Fourth District,

relying on *Geddes,* among other cases*,* affirmed the lower court's order granting the defendant's

motion to dismiss *with prejudice,* because the attorney's sending of the letter to their client did not

amount to a "publication."  The *Hoch* Court clarified that, "[i]n an attorney-client relationship, the

---

[15] As stated in its Motion to Strike, this Court should strike Plaintiff's demand for attorneys' fees and costs in the Wherefore Clause on page 41, as there is no basis for Plaintiff to recover fees in a defamation claim.

attorney is an agent and the client is the principal." *Id.* at 59.  Indeed, "[b]ecause their interests are so unified, a statement that the attorney makes to his or her client as part of the attorney-client relationship is analogous to the situations presented in *Geddes*, *Hicks & Grayson*, and *Maine*, where there was no publication to a third party because the communication was tantamount to the principal 'talking to itself.'" *Id.* (quoting *Geddes*, 960 So. 2d at 834).

Here, like in *Hoch*, Mantilla has taken offense at the content of the letter sent to him by PBC's attorney, and has taken the position that PBC's statements to its attorney *prior* to the preparation of this letter –underlined privileged, underlined unidentified statements– were defamatory. Not only is the Association's statement to its attorney an "intra-corporate communication," but such an erroneous proposition flies in the face of Florida law and the public policy principles governing the attorney-client relationship.  Accordingly, like in *Hoch,* Mantilla's defamation *per se* claim, premised upon PBC's underlined unidentified statements ***to its attorney*** should be dismissed *with prejudice*, and PBC should be entitled to an award of its fees incurred in preparing a response to said claim, as it was initiated without support in law or fact.

## V. PLAINTIFF'S CLAIM FOR VIOLATION OF § 772.104, FLORIDA CRIMINAL PRACTICES ACT (COUNT X) SHOULD BE DISMISSED WITH PREJUDICE FOR FAILURE TO STATE A CAUSE OF ACTION.

In Count X, Plaintiff Mantilla attempts to assert cause of action under § 772.104 for violation of Florida's Criminal Practices Act against the corporate Defendant, PBC, based upon PBC's alleged attempt to "extort" him under § 836.05.   As his basis, Plaintiff alleges that "[o]n January 19, 2023, Defendant PBC (through legal counsel) issued a Letter to Mantilla accusing Mantilla of 'blatantly violat[ing] criminal law by secretly recording conversations with PBC's representative without their knowledge or consent.'"  Compl. ¶ 203.  Plaintiff attached a copy of said letter as Exhibit N.  *See id.*   Chapter 772, Florida Statutes, allows private individuals to pursue

civil remedies for alleged criminal practices under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *See* Ch. 772, Fla. Stat. (2022).  As explained by the Florida Fourth District Court of Appeal, Florida's RICO law makes it unlawful for "[a]ny person '[t]hrough a ***pattern of criminal activity*** . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.'"  *Eagletech Communs., Inc. v. Bryn Mawr Inv. Group, Inc.*, 79 So. 3d 855, 864 (Fla. 4th DCA 2012).[16] Essential to any successful RICO claim are the basic requirements of establishing both a ***RICO enterprise*** and a "***pattern of racketeering activity***."  *Jackson v. BellSouth Telecommunications,* 372 F.3d 1250, 1263–64 (11th Cir. 2004).[17] Plaintiff has failed to, and cannot, establish either of these elements.

A ***RICO enterprise*** exists "where a group of persons associates, formally or informally, with the purpose of conducting illegal activity."  *United States v. Hewes,* 729 F.2d 1302, 1311 (11th Cir.1984). To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed **two or more predicate acts within a ten-year time span**; (2) the predicate acts were related to one another; and (3) **the predicate acts demonstrated criminal conduct of a *continuing* nature**.  *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239–43, 109 S.Ct. 2893, 2900–2903, 106 L.Ed.2d 195 (1989); *see also State v. Lucas,* 600 So.2d 1093, 1094 (Fla.1992) (adopting the criteria set forth in *H.J. Inc.*).  Indeed, "RICO targets ***ongoing* criminal activity**, rather than sporadic, isolated criminal acts . . . as opposed to sporadic, unrelated, isolated criminal episodes." *Jackson*, 372 F.3d at 1264 (11th Cir.

---

[16] "Criminal activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit . . . [a]ny crime that is chargeable by indictment or information," as defined under 23 enumerated statutes set forth in section 772.102(1)(a), Florida Statutes.  *See id.*

[17] Interpretation of Florida's RICO law "is informed by case law interpreting the federal RICO statute ... on which Chapter 772 is patterned." *Jackson*, 372 F.3d 1250, 1263–64.  *See also, All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir.1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases.").

2004) (internal quotes omitted).  To prove a "pattern of racketeering activity" it is not sufficient to simply establish two isolated predicate acts.  *Jackson*, 372 F.3d 1250, 1264.

Upon a cursory review of Plaintiff's RICO claim (Count X), Plaintiff has failed to allege *any* facts or even any plausible inferences which could ever establish a viable cause of action for civil RICO.   First, Plaintiff has referenced only one purported criminal act – i.e., PBC's sending of a letter to Plaintiff, via counsel, allegedly seeking to "extort" Plaintiff.   Even assuming, *arguendo*, that said letter constituted extortion (which it certainly does not), this sole act is insufficient to support a RICO claim; Plaintiff simply has not pled two predicate acts occurred, let alone acts of a continuing nature which could support a "***pattern of racketeering activity***." *See Jackson*, 372 F.3d 1250, 1264 (emphasis added).   Second, Plaintiff fails to allege existence of an enterprise under Florida's Civil RICO Statute, which is evident by the fact that Plaintiff has asserted this cause of action against a single entity, PBC.  In *Palmas Y Bambu, S.A. v. E.I. Dupont de Nemours & Co.*, the Florida Third District Court of Appeal determined that, for a civil RICO claim, "[w]here…an entity is both the 'person' and the sole entity comprising the 'enterprise,' the distinctness required does not exist." 881 So. 2d 565, 574-575 (Fla. 3d DCA 2004).  As discussed by the court, "alleging a RICO enterprise that consists merely of a corporate defendant [person] associated with its own employees or agents carrying on the regular affairs of the defendant" is improper.[18]  *Id.  See also*, *Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1998 U.S. Dist. LEXIS 8906, at *3 n.5 (S.D.N.Y. June 16, 1998) (observing that lawyers acting for a corporation are agents for RICO purposes).

---

[18] The Court specifically held that "Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation." *Palma,* 881 So. 2d at 574-575.

Here, Plaintiff wholly failed to establish the existence of any entity separate and apart from PBC; and even if Plaintiff attempted to replead and include the Defendant Board Members and/or the Association's attorney as members of any alleged enterprise, any such claim would still fail to establish an enterprise.  Accordingly, the allegations of the Complaint simply fail to meet the necessary elements required to state a civil RICO claim, as there is no alleged pattern of criminal activity, no enterprise, and no distinctiveness.  Based on these facts, Plaintiff cannot replead to assert otherwise.  Thus, this Court should dismiss the Plaintiff's civil RICO claim *with prejudice,* and award Defendant its reasonable attorney's fees and court costs incurred pursuant to § 772.104, upon a finding that Plaintiff raised the instant claim without factual or legal support.

## VI. PLAINTIFF'S CONVERSION (COUNT VIII) CLAIM FAILS TO STATE A CAUSE OF ACTION AND SHOULD BE DISMISSED WITH PREJUDICE.

Conversion requires "an unauthorized act which deprives another of his property ***permanently or for an indefinite period of time.***" *Schutt v. Lewis*, No. 6:12-CV-1697-ORL-37, 2014 WL 3908187, at *4 (M.D. Fla. Aug. 11, 2014) (quoting *Mayo v. Allen*, 973 So.2d 1257, 1258–59 (Fla. 1st DCA 2009) (emphasis added). While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555; *Iqbal,* 556 U.S. at 678.  Indeed, "[u]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Iqbal,* 556 U.S. at 678.  Here, Plaintiff's conversion claim lacks well-pleaded factual allegations that Defendant deprived Plaintiff of property for a "permanent or indefinite period of time." *See Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1291 (11th Cir. 2001).  Rather, Plaintiff appears to base his conversion claim the fact that PBC changed the locks to the Restaurant <u>located on PBC's property</u>, upon terminating the parties' Agreement.  *See, e.g.,* Compl. ¶ 86. First and foremost, it bears to note that Plaintiff was merely provided a "License" to

provide food and beverage services at the Premises, and that the parties' Agreement did not "provide [Plaintiff] with any possessory interest and/or estate in and to the Recreation Building or the Premises." Compl. At Exhibit C, ¶ 2.  Furthermore, Plaintiff admits that he was afforded access to the restaurant <u>two weeks later</u>.  *See* Compl. ¶ 183. Since a claim for conversion requires "possession of property by the wrongdoer" by an indefinite period of time, and Plaintiff has alleged that PBC's changing of locks resulted in the temporary deprivation of Plaintiff's property, Plaintiff has failed to state a claim for conversion and cannot reasonably amend to assert otherwise  *See Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1161 (Fla. 3d DCA 1984). Thus, Plaintiff's conversion claim should be dismissed *with prejudice*.  Furthermore, it bears to note that while the conversion claim references one item of property, it was brought by both Plaintiffs.  If not dismissed, *with prejudice*, Plaintiffs must clarify <u>who</u> owned the item at issue, to prevent Plaintiffs from obtaining a windfall by alleging ownership over the same property twice.

**VII.   PLAINTIFFS' CIVIL CONSPIRACY CLAIM (COUNT IX) FAILS TO STATE A CAUSE OF ACTION AND SHOULD BE DISMISSED WITH PREJUDICE.**

In Count IX of Plaintiffs' Complaint, Plaintiffs attempt to assert a cause  of action for civil conspiracy against the corporate Defendant, PBC, and all Defendant Board Members. *See id.* However, in line with the extensive case law cited herein addressing the relationships between a corporation and its directors, members and agents, Florida courts have repeatedly held that a claim for conspiracy cannot stand against an entity and its agents; a corporation is single entity which acts *through* its agents.  Thus, "it is well settled that a corporation cannot conspire with those persons unless the individual has a personal stake in the activity apart from that of the corporation." *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1029 (Fla. 3d DCA 1981).  *See e.g., Girard v. 94th Street and Fifth Avenue Corporation*, 530 F.2d 66 (2nd Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976) (suit brought under 42 U.S.C.A. 1985(3); board of

directors cannot conspire when acting in their official capacities). Here, the basis of Plaintiffs'
conspiracy claim is that PBC and the Board Members conspired to deprive Plaintiff of his property
by directing their agents to change the locks to the Restaurant (located on PBC's property). *See*
Compl. ¶ 194. Not only does Plaintiffs' claim include conclusory, threadbare recitations of the
elements of a conspiracy, but based on the limited facts included, it is clear PBC and its Board
<u>could not</u> conspire with each other. Accordingly, Plaintiffs' conspiracy claim against PBC – which
acts *through* its Board Members – and its Board Members must be dismissed *with prejudice.*

## CONCLUSION

WHEREFORE, the Defendants respectfully request that this Honorable Court dismiss,
*with prejudice,* Plaintiffs' claims for: 1) Violation of Florida's Private Whistleblower Act (Count
IV); 2) Tortious Interference with Contract (Count V); 3) Tortious Interference with Prospective
Business Relations (Count VI); 4) Defamation *Per Se* (both labeled Counts XIV); 5) Violation of
Florida Criminal Practices Act (Count X); 6) Conversion (Count VIII); and 7) Civil Conspiracy
(Count IX). Additionally, Defendants request that this Court dismiss the *entirety* of Plaintiffs'
Complaint as a shotgun pleading and require Plaintiff to replead its surviving claims so that the
Complaint contains: 1) *"discrete and succinct,"* numbered paragraphs limited to a single
transaction or occurrence; 2) separate counts for each separate cause of action Plaintiffs attempt to
assert against each Defendant; and 3) no scandalous, immaterial or otherwise improper allegations,
and no improper emphasis intended to inflame a potential jury.   Defendants request their fees
pursuant to the applicable statutes, Rules 11 and 54 of the Federal Rules, and section 23(c) of the
parties' Agreement, and any other relief this Court deems just and proper.  Further, Defendants
respectfully request the opportunity to present these voluminous arguments by way of oral
argument, should this Honorable Court deem it necessary.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed this <u>19th</u> day of May 2023 with the Clerk of Court using CM/ECF which will send electronic copies of same to all counsel of record.

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendants*
110 Tower
110 S.E. 6th Street, Suite 2700
Fort Lauderdale, Florida 33301
Telephone: (954) 703-3702
Facsimile: (954) 703-3701
Primary e-mail: craig.minko@csklegal.com
Primary e-mail: diana.rafael@csklegal.com
Secondary e-mail:  melissa.botero@csklegal.com
Secondary e-mail:  nikole.noble@csklegal.com

By: <u>  s/*Diana E. Rafael*                    </u>
Craig Minko
Florida Bar No.:  84499
Diana E. Rafael
Florida Bar No.:  1010306